**UNITED STATES of America, Plaintiff-Appellee,**

v.

**Edward Grady PARTIN, Defendant-Appellant.**

**No. 73–2295.**

United States Court of Appeals, Fifth Circuit.

May 6, 1974.

Rehearing Denied June 5, 1974.

---

William H. Jeffress, Jr., Washington, D. C., for defendant-appellant.

John W. Stokes, Jr., U. S. Atty., Atlanta, Ga., Howard E. Shapiro, Bruce B. Wilson, U. S. Dept. of Justice, Washington, D. C., for plaintiff-appellee.

Before COLEMAN, AINSWORTH and GEE, Circuit Judges.

COLEMAN, Circuit Judge:

On a change of venue to the Northern District of Georgia, a jury convicted Edward Grady Partin of conspiracy to violate the Hobbs Act, 18 U.S.C., § 1951, interfering with interstate commerce by threats or violence. Partin has appealed. After prolonged, painstaking analysis and reflection, we are constrained to hold that the conviction must be reversed and remanded despite the fact that the case, along with others intimately connected with it, has been around for a long time.[1]

On June 20, 1969, a grand jury empanelled in the Eastern District of Louisiana, Baton Rouge division, returned a five count indictment against two individuals, Ted Dunham, Jr., and Edward Grady Partin, and against three corporate defendants, Dunham Concrete Products, Inc., Louisiana Ready-Mix Company, Inc., and Anderson-Dunham, Inc. Three of the five counts were for Sherman Act violations, 15 U.S.C. § 1 et seq.,[2]

---

1. See Hoffa v. United States, 385 U.S. 293, 87 S.Ct. 408, 17 L.Ed.2d 374 (1966).

2. 15 U.S.C. § 1 provides as follows:
"Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is declared to be illegal: *Provided*, That nothing contained in sections 1 to 7 of this title shall render illegal, contracts or agreements prescribing minimum prices for the resale of a commodity which bears, or the label or container of which bears, the trademark, brand, or name of the producer or distributor of such commodity and which is in free and open competition with commodities of the same general class produced or distributed by others, when contracts or agreements of that description are lawful as applied to intrastate transactions, under any statute, law, or pub-

and two counts were for Hobbs Act violations, 18 U.S.C., § 1951.[3]

## I

Originally, this case was assigned to the Chief Judge, but he reassigned it first to Judge Lansing L. Mitchell, also of the Eastern District, then to a visiting judge, Honorable William D. Murray, United States District Judge for the District of Montana.

On October 1, 1969, Partin and Dunham filed a series of motions asking for dismissal of the indictment or for a change of venue. In his motion to dismiss Partin claimed that by virtue of his testimony under subpoena before a grand jury in Nashville, Tennessee, and because of his deposition testimony in a private antitrust suit prior to return of the indictment, he was entitled to transactional immunity, 15 U.S.C. § 32. Dunham also based his immunity claim on depositional testimony in the private lawsuit. A hearing was held on the motions, and in a written opinion by Judge Murray they were denied. The defendants were granted a change of venue to the New Orleans Division, with a severance for Partin. From the adverse ruling on the motion to dismiss, Partin took an immediate appeal to this Court, which was dismissed for want of jurisdiction, 28 U.S.C. § 1291, United States v. Partin, 5 Cir., 1970, 432 F.2d 556. On December 4, 1970, Judge Murray transferred Partin's case to the District of Montana, Butte Division.

---

lic policy now or hereafter in effect in any State, Territory, or the District of Columbia in which such resale is to be made, or to which the commodity is to be transported for such resale, and the making of such contracts or agreements shall not be an unfair method of competition under section 45 of this title: *Provided further,* That the preceding proviso shall not make lawful any contract or agreement, providing for the establishment or maintenance of minimum resale prices on any commodity herein involved, between manufacturers, or between producers, or between wholesalers, or between brokers, or between factors, or between retailers, or between persons, firms, or corporations in competition with each other. Every person who shall make any contract or engage in any combination or conspiracy declared by sections 1 to 7 of this title to be illegal shall be deemed guilty of a misdemeanor, and, on conviction thereof, shall be punished by fine not exceeding fifty thousand dollars, or by imprisonment not exceeding one year, or by both said punishments, in the discretion of the court."

15 U.S.C. § 2 provides as follows:

"Every person who shall monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize any part of the trade or commerce among the several States, or with foreign nations, shall be deemed guilty of a misdemeanor, and, on conviction thereof, shall be punished by fine not exceeding fifty thousand dollars, or by imprisonment not exceeding one year, or by both said punishments, in the discretion of the court."

3. 18 U.S.C. § 1951 provides as follows:

"(a) Whoever in any way or degree obstructs, delays, or affects commerce or the movement of any article or commodity in commerce, by robbery or extortion or attempts or conspires so to do, or commits or threatens physical violence to any person or property in furtherance of a plan or purpose to do anything in violation of this section shall be fined not more than $10,000 or imprisoned not more than twenty years, or both.

"(b) As used in this section—

"(1) The term 'robbery' means the unlawful taking or obtaining of personal property from the person or in the presence of another, against his will, by means of actual or threatened force, or violence, or fear of injury, immediate or future, to his person or property, or property in his custody or possession, or the person or property of a relative or member of his family or of anyone in his company at the time of the taking or obtaining.

"(2) The term 'extortion' means the obtaining of property from another, with his consent, induced by wrongful use of actual or threatened force, violence, or fear, or under color of official right.

"(3) The term 'commerce' means commerce within the District of Columbia, or any Territory or Possession of the United States; all commerce between any point in a State, Territory, Possession, or the District of Columbia and any point outside thereof; all commerce between points within the same State through any place outside such State; and all other commerce over which the United States has jurisdiction.

"(c) This section shall not be construed to repeal, modify or affect section 17 of Title 15, sections 52, 101–115, 151–166 of Title 29 or sections 151–188 of Title 45."

Partin's trial on all five counts began in Butte on June 14, 1971. After twenty-four days in trial, the jury reported that it was hopelessly deadlocked on all counts, and a mistrial was declared. The Court immediately set the case for retrial in November of that year. In August, the case was reassigned to Judge James F. Battin, of the District of Montana, and was transferred to the Billings Division.

Thereafter, upon motion by the defendant and with the agreement of the government, Judge Battin granted a change of venue to Atlanta, Georgia, for the convenience of witnesses and counsel. Partin's second trial, again on all five counts, began in Atlanta on January 31, 1972. At the close of the government's case, Judge Battin dismissed Count 4 and took under advisement defendant's motion for a mistrial as to the other counts. After eighteen days in trial and two days of deliberation, the jury returned a verdict of guilty on the four remaining counts.

In an opinion and order dated March 24, 1972, Judge Battin granted the defendant's motion for a judgment of acquittal notwithstanding the verdict on Counts 1, 2, and 3 for the reason that the evidence was insufficient to sustain convictions under these counts. This left only Count 5 of the original indictment.[4] The Court granted the defendant's motion for a new trial on that Count because the testimony admitted to prove Count 4 had been so prejudicial that its effect could not have been cured by an instruction to the jury to disregard it.

On June 26, 1972, Judge Battin entered an order stating that Judge Manuel L. Real of the Central District of California had accepted assignment of the case. Judge Real presided over the trial now under review.

### Statement of the Facts Concerning the Hobbs Act Violation

[Stated in the light most favorable to the verdict]

In January, 1968, W. O. Bergeron, the owner and president of a construction company bearing his name, was awarded a street improvement contract at the Jumonville Subdivision in Plaquemine, Louisiana. Prior to this time, Bergeron had purchased his pipe solely from Anderson-Dunham Company, the largest producer of concrete pipe in the Baton Rouge area; but in an effort to diversify his suppliers, he decided to divide his orders equally between Dunham and its only competitor, Stevens Concrete Pipe and Products, Inc. Dunham, through its

---

4. *Count Fire*

"The charges contained in paragraphs one through nine of this indictment are hereby incorporated in this count with the same force and effect as if those paragraphs were here set forth in full.

XIII

*Offense Charged*

"Beginning at the time of the initial stages of construction of a City Streets Sewerage Project, Plaquemine, Louisiana, on or about January, 1968, and continuing thereafter through the construction of said project, the exact dates being to the Grand Jurors unknown, in the Baton Rouge Division of the Eastern District of Louisiana and within the jurisdiction of this Court, defendants did willfully, unlawfully, and feloniously conspire and agree, each with the other, to obstruct, delay, and affect commerce, as that term is defined in Section 1951 of Title 18, United States Code, and the movement of cement and other building materials in such commerce, by attempting extortion (as defined in said section of United States Code), that is to say, said defendants attempted to obtain property in the value of the profits to be realized by defendant Anderson Dunham, Inc. from the sale of concrete pipe to W. O. Bergeron as agent and representative of the W. O. Bergeron Construction Company, Inc. with his consent, induced by the wrongful use of fear, force and physical violence in that defendant Edward Grady Partin, acting in furtherance of the aforesaid conspiracy and agreement threatened to cause and did cause strikes, work stoppages and physical violence by members of the General Truckdrivers, Warehousemen and Helpers Local Union No. 5 at the site of the aforesaid project, unless and until such time as said W. O. Bergeron Construction Company agreed to purchase the total requirements of concrete pipe for said project from defendant Anderson-Dunham, Inc."

president, Ted Dunham, Jr., decided that it did not like the competitive market and that something had to be done about Stevens. Ted Dunham decided to enlist the aid of a longtime friend, Edward Grady Partin. Partin, the business manager of the Teamsters Local No. 5 in Baton Rouge, was in an excellent position to influence contractors in the area by simply calling a strike or sending a group of visitors to try persuading an employer to act differently. This latter course of action was taken in an effort to persuade Bergeron to revert to his former purchasing methods.

Dunham discovered Bergeron's change in practice when he sent one of his salesmen, Billy Rogers, by the worksite to determine if anything was needed. Before entering Bergeron's premises, Rogers noticed that Stevens had already delivered several loads of pipe. He immediately returned to Baton Rouge and informed Dunham of his observations. Becoming highly perturbed, Dunham called Partin and demanded action.

McClanahan, Partin, and another teamster first drove to Plaquemine and visited with the sheriff for approximately twenty minutes. Upon their return to the union hall, Partin ordered McClanahan to effect a "shut down" at Bergeron's site. This was accomplished, and Bergeron was forced to cut short his work day. Later that night McClanahan, Partin, and Dunham again returned to Plaquemine and the sheriff's office. Later, there was talk that no matter what happened at the Bergeron site there would be no interference by the police.

The next day McClanahan and an associate returned to the site. Without identifying himself, or justifying his presence, McClanahan warned Bergeron not to go to work and threatened to return with enough men to effect another shut down. His words fell upon deaf ears.

In an effort to determine what their next course of action would be, McClanahan consulted Partin by telephone. Directing him to return to the union hall, Partin stated that he would gather enough men in the interim to teach Bergeron a lesson. Upon his return, Partin instructed McClanahan to take a machine gun with him to "shoot up" Bergeron's equipment. This course of action was abandoned on advice of Partin's counsel [not the one here] and shotguns were chosen instead. Accompanied by thirty or forty men armed with bats and chains, McClanahan returned to the site and "put a beating on Bergeron and his employees". During the fracas, Bergeron, his brother, and his sixty-three year old father were hit by shotgun pellets. For his leadership in this incident, McClanahan received $1,000 in cash from Partin and he also received two years in the penitentiary from the State of Louisiana. As will later be seen, McClanahan did not serve that sentence at Angola.

Along with evidence establishing the corpus delicti, the government was also allowed to present evidence to show that Partin had received over $21,000 from Dunham and that he aided Dunham in another effort quite similar to the incident at bar.

The foregoing evidence on behalf of the government, if believed by the jury, reflects a highly calloused contempt for the law and an equal disrespect for the rights of others. It is such that no court could, or would, condone. Yet, the law guarantees those accused of the most reprehensible behaviour a fair trial according to law. The question in this appeal is whether Partin had such a trial.

## II

We consider it necessary to discuss only four of the assignments of error, as follows:

A. Did the defendant receive transactional immunity from prosecution for the Hobbs Act violation pursuant to former 15 U.S.C. § 32 by virtue of his testimony under subpoena before a Nashville, Tennessee, grand jury?

B.  Was the defendant entitled to introduce evidence as to the total sums paid by the government to Rogers and McClanahan as material witnesses?

C.  Was the defendant erroneously denied instructions as to the testimony of impeached witnesses?

D.  Was the defendant entitled to introduce evidence either by cross-examination or collateral witnesses to show Rogers' past mental condition?

## A.  *Immunity*

Collaterally to the Hobbs Act violation, Partin was still embroiled in the Hoffa case.  In 1964, James Hoffa, President of the International Brotherhood of Teamsters, and others were tried and convicted for endeavoring to bribe members of a jury trying Hoffa for violating the Taft-Hartley Act.  "A substantial element in the Government's proof that led to the convictions of [Hoffa and other defendants] was contributed by a witness named Edward Partin, who testified to several incriminating statements which he said petitioners Hoffa and King had made in his presence during the course of the Test Fleet trial [the trial of the Taft-Hartley Act charge]", Hoffa v. United States, 385 U.S. 293, 295, 87 S.Ct. 408, 410, 17 L.Ed.2d 374.

Following that testimony, Partin complained to federal officials of alleged efforts to intimidate, bribe, and corrupt him as part of a continuing and concerted attempt to have him recant his testimony.  These reports resulted in the assignment of United States Marshals to protect him.

Partin's allegations were investigated by the Department of Justice, through its Criminal Division, and by two federal grand juries.  It is upon the testimony given to one of these grand juries that Partin rests his claim of transactional immunity.[5]

On October 4, 1968, eight months before the return of the indictment in this case, Partin was subpoenaed to testify before a Nashville, Tennessee, grand jury.  During the course of the inquiry, he was asked about the "Bergeron incident".

The apparent purpose of this inquiry was to determine if the arrests made during the incident were related to the attempts to get Partin to change his testimony about Hoffa.  In essence, was this an attempt to bargain with the arrested parties to exchange testimony against Partin for dismissal of the charges against them?

The substance of the testimony related to why the teamsters picketed Bergeron's worksite—the use of non-union employees—and that Bergeron actually started the violence.  According to Partin, the Bergeron Company had a contract to construct a large sewage project and was hiring non-union workers.  McClanahan and another were ordered to picket the site but were threatened by Bergeron and warned not to come back.  When the two returned the next day, an armed crew of Bergeron's construction workers threatened them.  The visitors then returned to the union hall to ask for more pickets.  Partin's attorney, who was present, told them not to take any weapons with them and to report any trouble to the authorities.  Partin repeated this advice and then left for the courthouse before the pickets left the union hall.  While Partin was in the courthouse speaking with his lawyer and a judge, he heard over the radio that

5.  "No person shall be prosecuted or be subjected to any penalty or forfeiture for or on account of any transaction, matter, or thing concerning which he may testify or produce evidence, documentary or otherwise, *in any proceeding, suit, or prosecution under sections 1–7 of this title and all Acts amendatory thereof or supplemental thereto*, and sections 8–11 of this title: *Provided*, That no person so testifying shall be exempt from prosecution or punishment for perjury committed in so testifying."  [Emphasis added].  15 U.S.C. § 32.

This section has, since Partin's indictment, been repealed and in its stead Congress enacted 18 U.S.C. § 6001 et seq.  This section is still binding upon us in this action as a result of Pub.L. 91–452, § 260.

there had been a shooting at the Bergeron site. Partin then testified about the shooting, essentially that Bergeron's crew started shooting at the teamster pickets and that one of the teamsters returned the fire. The remainder of his testimony was to the effect that the teamsters were charged and arrested as a result of the incident; that bail was deliberately made difficult for them; that the bonding company cancelled the bonds as a part of an effort "to bust the local"; and that the Governor of Louisiana and the local judge, among others, were part of that effort. He ended his testimony on the point that W. O. Bergeron admitted to him and others that members of his crew had fired on the teamster pickets first.

■ We find no merit in defendant's contention that this testimony entitled him to immunity in this prosecution. A specific factor is fatal to his claim; the statute expressly limits itself to prosecutions arising under Title 15. This, however, is a prosecution for a violation of the Hobbs Act, 18 U.S.C. § 1951, which by its own language is neither a part of, nor amendatory to, Title 15. Therefore, 15 U.S.C. § 32, confers no immunity in this case.

### B. Benefits Paid to Material Witnesses

■ The defendant's second assignment is directed toward the trial court's exclusion of evidence relating to the total benefits paid the witnesses Rogers and McClanahan while they were in protective custody.

McClanahan, a star witness for the prosecution, testified that after his trial and conviction in state court for his participation in the Bergeron incident, he decided to turn state's evidence against Partin, although for the previous two years he had continually denied Partin's participation. Fearing for their newly acquired witness' life and safety, the ·

United States Attorney and the Antitrust Division sought and received a writ of habeas corpus from Judge Christenberry directing the warden of the Louisiana State Penitentiary to turn the person of Wade McClanahan over to the Attorney General of the United States. McClanahan, his wife, and four children were then placed in protective custody and moved to the United States Army post at Fort Sill, Oklahoma. Once in custody, the government furnished the witness with living quarters and a subsistence allowance. This consisted of rent payments of $107 per month and subsistence payments of $2.11 per person per day.

In mid-summer of 1972, for the first time since he was taken into custody, efforts were made by outsiders to contact McClanahan. For security reasons, the family was then moved from Fort Sill to a place known only to the United States Marshal. Due to the lack of commissary and housing benefits after the move, the cost of maintaining the McClanahans increased. Accordingly, for the last few months before the trial below, the government paid rent of $188 per month and a subsistence allowance of $4.17 per person per day. In total, McClanahan received $26,000.

Rogers, on the other hand, was taken into custody only for brief periods around the time of each of appellant's earlier trials. He was also placed in protective custody for a short period after having been severely beaten by two men. He was paid approximately $8 to $12 per day subsistence; and when necessary, a motel room or other lodgings were furnished. In total, Rogers received approximately $5,000.

■ Both sides agree that the government derives its authority to pay the maintenance costs of material witnesses in protective custody from 28 U.S.C. § 524.[6] Subsequent to the return of the

6. 28 U.S.C. § 524 provides as follows:
"Appropriations for the Department of Justice are available for payment of—

(1) notarial fees, including such additional stenographic services as are required in connection therewith in the taking of deposi-

758

indictment against Partin, Congress enacted the Organized Crime Control Act of 1970, Pub.L. 91–452. Section 501 et seq. of that Act, 18 U.S.C. prec. § 3481,[7] codified what had previously existed as Justice Department regulations promulgated under 28 U.S.C. § 524. In essence, § 501 et seq. provide the Attorney General with the authority to protect and maintain any witness whose life and limb may be in jeopardy because of his testimony; and as a means of implementation, the government is authorized by § 502 to provide shelter and subsistence.

The controversy here arises over whether the defense counsel should have been allowed on cross-examination to elicit *the total amounts* paid to the two witnesses pursuant to 28 U.S.C. § 524. After allowing counsel to draw testimony from both Rogers and McClanahan about the rent and subsistence payments, the Court cut him short when the subject turned to the *totals*. Holding such irrelevant, the Court stated:

"[T]he Court finds—at least, the payments made to Mr. Rogers and to Mr. McClanahan were within the statutory provisions for protective custody of material witnesses and would not be in the nature of any reward or compensation for their services to the government in any capacity; and, therefore, would not be a subject of questions of cross-examination to them for the purposes of impeachment of their testimony on the basis of reward."

The defendant questions this ruling and likens the situation to the cases holding that evidence of total payments to informers is admissible to cast doubt upon their credibility.

Following the trial court's reasoning, the government contends that this is not a case of gratuitous benefaction or reward as to be found in the informer cases; but instead, is a matter of necessity, pure and simple. The payments were means to the end, preservation of the witnesses' testimony. Too, the introduction of the totals could lead to potentially prejudicial sideroads in an attempt to rehabilitate the witnesses. For example, what was the danger or other circum-

---

tions, and compensation and expenses of witnesses and informants, all at the rates authorized or approved by the Attorney General or the Assistant Attorney General for Administration; and

(2) when ordered by the court, actual expenses of meals and lodging for marshals, deputy marshals, or criers when acting as bailiffs in attendance on juries."

**7.** *"Protected Facilities for Housing Government Witnesses*

"Sec. 501. The Attorney General of the United States is authorized to provide for the security of Government witnesses, potential Government witnesses, and the families of Government witnesses and potential witnesses in legal proceedings against any person alleged to have participated in an organized criminal activity.

"Sec. 502. The Attorney General of the United States is authorized to rent, purchase, modify, or remodel protected housing facilities and to otherwise offer to provide for the health, safety, and welfare of witnesses and persons intended to be called as Government witnesses, and the families of witnesses and persons intended to be called as Government witnesses in legal proceedings instituted against any person alleged to

have participated in an organized criminal activity whenever, in his judgment, testimony from, or a willingness to testify by, such a witness would place his life or person, or the life or person of a member of his family or household, in jeopardy. Any person availing himself of an offer by the Attorney General to use such facilities may continue to use such facilities for as long as the Attorney General determines the jeopardy to his life or person continues.

"Sec. 503. As used in this title, 'Government' means the United States, any State, the District of Columbia, the Commonwealth of Puerto Rico, any territory or possession of the United States, any political subdivision, or any department, agency, or instrumentality thereof. The offer of facilities to witnesses may be conditioned by the Attorney General upon reimbursement in whole or in part to the United States by any State or any political subdivision, or any department, agency, or instrumentality thereof of the cost of maintaining and protecting such witnesses.

"Sec. 504. There is hereby authorized to be appropriated from time to time such funds as are necessary to carry out the provisions of this title."

Pub.Law 91–452, § 501 et seq.

stances which necessitated taking the witnesses into protective custody so that the payments do not appear to be gratuitous? Why was the trial delayed so as to cause the amounts to increase to their present levels? What were the circumstances surrounding the efforts to contact McClanahan in mid-summer, 1972, which necessitated increased payments?

■■ The admissibility of evidence in a criminal trial is governed by Rule 26 [8] of the Federal Rules of Criminal Procedure. This rule requires the application of the common law as interpreted by the federal courts in light of reason and experience, except where Congress or any of the other criminal rules provide otherwise, O'Brien v. United States, 5 Cir., 1969, 411 F.2d 522. This Court has on numerous occasions held that in ruling on evidentiary questions the trial court has wide latitude and its rulings thereon should not be disturbed in the absence of an abuse of discretion, O'Brien v. United States, *supra*; United States v. Garr, 5 Cir., 1972, 461 F.2d 487, cert. denied, 409 U.S. 880, 93 S.Ct. 170, 34 L.Ed.2d 135 (1972).

As to the exercise of that discretion in this case, it was certainly not improper for the government, in compliance with the statute, to take the action it did for the protection of McClanahan and Rogers in order to insure their availability as witnesses.

The cause for concern, however, is that by changing his former statements and agreeing to become a government witness McClanahan not only escaped the service of his sentence at Angola but over a period of two or more years he was allowed to serve that sentence in "protective custody" with his family, was shown such special privileges as being allowed to leave Fort Sill to drive racing cars at Lawton, under the protection of federal bodyguards, and received $26,000 in financial benefits for himself and family. Under the circumstances of this case, and we decide no other, we are of the opinion that the defense, without cavil, should have been entitled to show the total financial benefits received. They were unusually high and McClanahan would never have received them had it not been for his agreement to testify for the government. Its impact, if any, on his credibility was for the jury, not for the prosecutors or the Court.

In response to this situation, we are well aware that the trial record shows the jury to have been informed of every facet of this matter except the *total* of the money the government spent on behalf of McClanahan and his family. Additionally, it is true that on cross-examination counsel for Partin extracted from McClanahan that on at least three occasions he had sworn falsely, in writing, that Partin was not involved in the Bergeron incident. Moreover, he was compelled to admit that he had been convicted of forgery on one occasion and of theft on another. Consequently, McClanahan stood before the jury as a devastatingly impeached witness, both as a self confessed perjurer and as a thrice convicted criminal.

The general reaction would be that although McClanahan was thus unclothed of veracity in general, the jury nevertheless believed that he was telling the truth about Partin's connection with the Bergeron affair. This would lead to the conclusion that specific jury knowledge of the $26,000 item would not have turned the tide.

As will be seen *infra,* the Judge, at the close of the trial, expressly declined to charge the jury as to the credibility of witnesses. In that context, we cannot

---

8.  *Evidence*

"In all trials the testimony of witnesses shall be taken orally in open court, unless otherwise provided by an act of Congress or by these rules. The admissibility of evidence and the competency and privileges of witnesses shall be governed, except when an act of Congress or these rules otherwise provide, by the principles of the common law as they may be interpreted by the courts of the United States in the light of reason and experience."

Fed.R.Crim.P. 26.

hold this to be harmless error and should McClanahan testify in another trial the full facts surrounding this $26,000 expenditure should be submitted to the jury.

C. *Was the Defendant Erroneously Denied Instructions as to the Testimony of Impeached Witnesses*

It is fundamental that for purposes of impeachment a litigant may show, among other things, that a witness against him has made prior inconsistent statements, that he has a motive for giving false testimony, or that he has in the not too remote past been convicted of a felony. It necessarily follows that the trial jury, certainly upon request, should be informed of the purpose for which such evidence has been admitted, else the right of impeachment is in danger of impermissible dilution.

We note, for example, that in the case of Hoffa v. United States (Fn. 1), where the defendant here, Partin, was a witness for the government, the jury was instructed as follows:

"You should carefully scrutinize the testimony given and the circumstances under which each witness has testified, and every matter in evidence which tends to indicate whether the witness is worthy of belief. Consider each witness' intelligence, his motives, state of mind, his demeanor and manner while on the witness stand. Consider also any relation each witness may bear to either side of the case * * *. All evidence of a witness whose self-interest is shown from either benefits received, detriments suffered, threats or promises made, or any attitude of the witness which might tend to prompt testimony either favorable or unfavorable to the accused should be considered with caution and weighed with care." 87 S.Ct. at 418.

In connection with that instruction the Supreme Court commented, "The established safeguards of the Anglo-American legal system leave the veracity of a witness to be tested by cross-examination, and the credibility of his testimony to be determined by a properly instructed jury. * * * The trial judge instructed the jury, both specifically and generally, with regard to assessing Partin's credibility".

The Supreme Court has recognized that where the government's case in a criminal prosecution may stand or fall on the jury's belief or disbelief of one witness, that witness's credibility is subject to close scrutiny, Gordon v. United States, 344 U.S. 414, 73 S.Ct. 369, 97 L. Ed. 447 (1953). This Court so stated in McConnell v. United States, *post*, 5 Cir., 1968, 393 F.2d 404.

Government witness McClanahan had been convicted of forgery, had been convicted of aggravated assault, and had been convicted of theft. He had made prior statements under oath, and in writing, which were altogether inconsistent with his trial testimony. He admitted committing acts of vandalism.

Billy Rogers had been convicted of forgery; had been dishonorably discharged from the Marines; admitted that during the events about which he testified he contemplated stealing $20,000 from Dunham; and had also made statements under oath quite inconsistent with his trial testimony.

Here, there were two witnesses, instead of one, but they were "two of a kind"—both ex-convicts of felony and both self admitted perjurers, committed on more than one occasion.

What makes this all the more critical is that without these witnesses the prosecution had no case on Count 5.

It has been held that where an admitted perjurer testified in a criminal prosecution, the trial court *must* charge that the testimony of that witness is to be scrutinized with care, United States v. Margolis, 3 Cir., 1943, 138 F.2d 1002.

This brings us to the fatal trial blemish which, as we understand the law, leaves no alternative to a new trial.

On February 21, before testimony began, the trial judge made the following statement to the jury:

" . . . You should in your evaluation of the testimony of witnesses carefully scrutinize all of the testimony given, consider the circumstances under which each witness testifies and whether there is a matter in evidence which tends to indicate whether a witness is worthy of belief. You should consider each witness's intelligence, motive, state of mind, demeanor and manner while on the stand."

[Nothing said about the assessment of credibility of witnesses convicted of felony and guilty of perjury as to the very subject matter then on trial].

Six days later, at the charge conference, the defense insisted that the jury be instructed as to the credibility of interested witnesses, the impeachment of witnesses by prior inconsistent statements, and impeachment of witnesses by proof of felony convictions. Counsel for the defendant stated, "[O]ur case, of course, stands or falls on the credibility of Rogers and McClanahan". The Judge responded, "No question about that, Mr. Neal" [Trial transcript, 1115].

When defense counsel continued to insist on these instructions, the Court responded, "I may make this a test to see whether or not the primary instructions have any value * * * I haven't been able to test them since I've been on the Bench with the permanent instructions. Maybe they ought to be tested".

After some further discussion the Court said, "Well, I don't propose to instruct the jury again on the credibility of witnesses. I think I've done that adequately" [referring to the statement made to the jury at the beginning of the case].

In the formal jury charge, the Court made no reference whatever to these credibility factors, that is, testimony of interested witnesses, impeachment of witnesses by prior inconsistent statements, and impeachment of witnesses by proof of felony convictions. The defense objected to the omission and the objection was overruled.

In United States v. Megna, 5 Cir., 1971, 450 F.2d 511, this Court wrote that "Nearly fifty years ago the Circuit Court of Appeals for the Fifth Circuit laid down the rule that 'Where the evidence presents a theory of defense, and the court's attention is particularly directed to it, it is reversible error for the court to refuse to make any change on such theory' ".

In Strauss v. United States, 5 Cir., 1967, 376 F.2d 416 cited in *Megna, supra*, it was said:

"The judge must, therefore, be cautious and unparsimonious in presenting to the jury all of the possible defenses which the jury may choose to believe. We hold that where the defendant's proposed charge presents, when properly framed, a valid defense, and where there has been some evidence relevant to that defense adduced at trial, then the trial judge may not refuse to charge on that defense. In Tatum v. United States, 1950, 88 U.S.App.D.C. 386, 190 F.2d 612, 617, the D. C. Circuit said:

" 'We do not intend to characterize the case for the defense as either strong or weak. That is unnecessary for 'in criminal cases the defendant is entitled to have presented instructions relating to a theory of defense for which there is any foundation in the evidence, even though the evidence may be weak, insufficient, inconsistent, or of doubtful credibility. He is entitled to have such instructions even though the sole testimony in support of the defense is his own' " . . . .

"The proper standard was not met here. The jury did not have to believe the defenses, but it should have been given the opportunity. This is true even if the defense is fragile. A defendant cannot be shortchanged nor his jury trial truncated by a failure to charge."

██ Partin's defense was that the testimony of all the indispensable wit-

nesses against him was false. If accepted by the jury this, of course, was a valid defense. That is what the jury, under the proper instructions, was there to decide. It received and decided the case with no guidance on the evaluation of McClanahan's and Rogers' testimony. Consequently, the failure to charge on this subject, especially when requested, denied, and that denial objected to, not only had the effect of cutting off Partin's defense, but upon request he would have been entitled to the instructions in any event. Despite the impeaching testimony, the jury obviously believed the witnesses, but the question remains: Would it have done so had it been properly instructed along the lines requested? We do not know, but the defendant was entitled to the chance that it might do so. We cannot paper this over with the doctrine of harmless error.

■ One additional comment is required. Rule 30 of the Federal Rules of Criminal Procedure directs that the court shall instruct the jury *after the arguments are completed.* There are several reasons for the rule, among which is the fact that at this juncture the evidence is in and the issues have been fully developed. There is the distinct possibility that the remarks of the court at the opening of the trial may not be clearly recalled many days later. At the close of the case, counsel must have a chance to object to any errors of omission or commission in the charge. We see nothing wrong, of course, in making the preliminary statement which the trial judge made at the opening of this case and upon which he chose to rely in sending the case to the jury. In the circumstances of this case, however, that cannot serve as substitute for the procedure specifically directed by Rule 30.

D. *The Admissibility of Rogers' Hospital Records and Expert Testimony as to his Past Mental Condition*

The first federal decision in this field [impeachment for psychiatrical reasons] seems to have occurred in the noted case of United States v. Hiss, 88 F.Supp. 559 (S.D., N.Y., 1950). There, as here, the defendant sought to introduce psychiatric testimony to discredit the government's key witness, Whittaker Chambers. Holding evidence of insanity or mental derangement to be admissible for credibility purposes, the Court stated that such evidence not only went to the preliminary question of competency but also to the jury question of credibility.

The basic precepts of the *Hiss* ruling have been followed in at least three Circuits: Sinclair v. Turner, 10 Cir., 1971, 447 F.2d 1158, cert. denied, 405 U.S. 1048, 92 S.Ct. 1329, 31 L.Ed.2d 590 (1972); Ramsèyer v. General Motors Corporation, 8 Cir., 1969, 417 F.2d 859; United States v. Allegretti, 7 Cir., 1964, 340 F.2d 254, cert. denied, 381 U.S. 911, 85 S.Ct. 1531, 14 L.Ed.2d 433 (1965). Interestingly enough, except for Florida and Louisiana, all of the states comprising the Fifth Circuit have confronted this issue. Of the four, three follow *Hiss*, with Texas comprising a distinct minority of one, Bonner v. State, 59 Ga. App. 737, 1 S.E.2d 768 (1939); Walley v. State, 240 Miss. 136, 126 So.2d 534 (1961); Brown v. State, 45 Ala.App. 391, 231 So.2d 167 (1970); Hopkins v. State, 480 S.W.2d 212 (Tex.Cr.App., 1972).

■ The readily apparent principle is that the jury should, within reason, be informed of all matters affecting a witness's credibility to aid in their determination of the truth, Walley v. State, *supra*. It is just as reasonable that a jury be informed of a witness's mental incapacity at a time about which he proposes to testify as it would be for the jury to know that he then suffered an impairment of sight or hearing. It all goes to the ability to comprehend, know, and correctly relate the truth.

This Court recently had occasion, McConnell v. United States, 5 Cir., 1968, 393 F.2d 404, to reiterate its policy of broad scoped cross-examination of witnesses on matters going to their credibility. McConnell was convicted by a jury of having passed and uttered a

forged United States postal money order. His conviction was reversed because the defendant had not been allowed fully to probe the credibility of the government's handwriting expert. The Court said, "It is well established that in criminal cases great latitude is generally permitted in the cross-examination of a prosecution witness in order to test his credibility * * *. Cross-examination is a right and its availability is essential to a fair trial; accordingly, cross-examination of a witness in matters pertinent to his credibility ought to be given the largest possible scope. * * * It is improper for a trial judge to restrict the cross-examination of a Government witness where counsel for defendant attempted to ask an impeaching question and was endeavoring to explore the possibility that the testimony of the witness may have been in some way influenced by suggestions or statements made to him. * * * Where the Government's case may stand or fall on the jury's belief or disbelief of one witness, its credibility is subject to close scrutiny", 393 F.2d at 406. See, also, United States v. Greenberg, 5 Cir., 1970, 423 F.2d 1106; United States for Use of Tennessee Valley Authority v. Robertson, 5 Cir., 1966, 354 F.2d 877.

■ In simple language, the defendant has the right to explore every facet of relevant evidence pertaining to the credibility of those who testify against him, United States v. Greenberg, supra; United States for Use of Tennessee Valley Authority v. Robertson, supra.

■ Partin had the right to attempt to challenge Rogers' credibility with competent or relevant evidence of any mental defect or treatment at a time probatively related to the time period about which he was attempting to testify.

On cross-examination, Rogers admitted that in June, 1967, a few months prior to the events in November and December which constituted the time focus of his testimony, he had himself admitted as a patient at the Veterans Administration Hospital in Houston, Texas. He was then asked, "You were in there for mental illness; were you not"? He replied, "No, Sir".

The defense then offered a duly certified copy of Rogers' Veterans Administration hospital records as received from the Chief of the Medical Admissions Division of the hospital. No objection was raised to the admissibility of the records under the Business Records Act. The Court declined to admit the records on the ground that they were not "admissible for purposes of impeachment of Mr. Rogers' testimony". Defense counsel stated he was not "talking about impeachment" but about "cross-examination of his ability to hear, see, remember, relate". The Court observed that this was impeachment "under another name" and adhered to its ruling.

It appears that the records were admitted in a previous trial before another judge. The hospital record rejected in the trial now under review shows that upon admission Rogers stated that he was having auditory hallucinations and that at times he thought he was some other person. It also shows that he was pronounced "competent" upon release, but was told to come back for further checks, which he did not do.

■ The law on this subject in this Circuit is, we believe, well settled and that by cases of comparatively recent origin. It is undoubtedly true that the part of a hospital record containing an opinion of the attending physician or physicians may not be admitted under the Business Records Act unless that physician is available for cross-examination, Birdsell v. United States, 5 Cir., 1965, 346 F.2d 775; United States v. Harper, 5 Cir., 1971, 450 F.2d 1032; United States v. Davila-Nater, 5 Cir., 1973, 474 F.2d 270. Rogers' Veterans Administration doctor could not recall anything of his case, so he could not testify, and not testifying he could not be cross-examined.

■ That portions of a hospital record showing statements of the pa-

tient-witness, notation of symptoms, and treatment rendered are admissible as factual data, United States v. Minor, 5 Cir., 1972, 459 F.2d 103, citing Kuklis v. Hancock, 5 Cir., 1970, 428 F.2d 608 and *Birdsell, supra.*

■ Moreover, although medical reports containing expert opinions as to sanity may not be admitted directly into evidence, they may be used by other experts in arriving at a conclusion as to an individual's sanity, upon which the expert is open to cross-examination as to the weight he gave the reports and why, United States v. Davila-Nater, *supra,* 474 F.2d at 283.

Defense counsel offered the records as a predicate for cross-examination, not as evidence in chief, and such cross-examination could easily have been confined within the bounds hereinabove set forth.

In the following words the Court declined to permit the offer of the records for purposes of cross-examination:

"The records, either as part of the cross-examination of the witness, Billy Rogers, or for any purposes to impeach the testimony of Billy Rogers are not relevant or material, at least for the purposes of this ruling in their present form without testimony to support that the condition set forth —if it was a condition—was such a disability as to prevent the witness from perceiving, understanding, and remembering the events in October and November of 1967 to which he testified."

■ In the light of the cases above cited, the Court there fell into error. It was not harmless because the jury was entitled to know and consider that a few months before the alleged occurrence of the crime charged in the indictment, Rogers voluntarily committed himself to a hospital, reporting auditory hallucinations [hearing things that were not there] and also complaining that at times he thought he was some other person. Moreover, this was a direct refutation of Rogers' prior denial that he entered the hospital for mental treatment.

■ The defendant then called Dr. Otto Billig, a psychiatrist from Nashville, Tennessee. Basing his testimony upon the Veterans Administration record, Dr. Billig testified, *out of the presence of the jury,* that he could state to a reasonable degree of medical certainty that (1) Rogers did suffer from schizophrenic reaction, undifferentiated type, in June, 1967, and (2) that such would have a *tendency* to affect his ability to see and hear in October and November of that year. By way of explanation, the doctor stated that this particular type of schizophrenia was a serious mental illness which tended to become chronic if the patient went untreated. He further stated that in his opinion, the condition diagnosed in June of 1967 *would have a tendency* to affect Rogers' ability to see and hear accurately in October and November and that such would definitely affect his ability to report actual facts. During this time, according to the doctor, Rogers would seem confused and would tend to distort reality.

Because Dr. Billig could not state to any degree of *medical certainty* that Rogers could not perceive or understand what was happening around him in October and November, the jury was not allowed to hear the expert opinions above described. The cited cases teach that this, too, was erroneous. Based on the hospital records he should have been allowed to state his expert opinions, he should have been subjected to cross-examination, and the weight of his testimony, if any, should have been left to the assessment of the jury.

Numerous other errors are assigned, some of them critically approaching error if not actually reaching it. We assume, we think justifiably, that there is little likelihood of their recurrence at another trial, so we do not prolong this opinion with further discussion.

### Conclusion

Upon a retrial of this case, the defendant, within reasonable bounds, should be allowed, if he so desires, to de-

velop by competent evidence all facts which might reasonably be calculated to show a motive for false testimony on the part of McClanahan and Rogers, including special privileges enjoyed by McClanahan while in protective custody and including proof of the $26,000 received by McClanahan and his family. The jury must be given adequate guidance in the assessment of witness credibility. If offered, to the extent herein indicated, Rogers' hospital records and the testimony of expert witnesses will not be rejected.

The judgment of the District Court is Reversed and remanded.