UNITED STATES of America

v.

Michael SESSA, Defendant.

No. CR 92–351.

United States District Court,
E.D. New York.

Nov. 20, 1992.

Andrew J. Maloney, U.S. Atty. by George A. Stamboulidis, Andrew Weissmann, Brooklyn, N.Y., for the U.S.

Marvin B. Segal, Gavin W. Scotti, New York City, for the defendant.

## MEMORANDUM AND ORDER

WEINSTEIN, District Judge:

Defendant Michael Sessa was convicted, pursuant to an eight-count indictment, of racketeering, racketeering conspiracy, murder, murder conspiracies and loansharking conspiracies. The testimony of Joseph Ambrosino, a coconspirator who pled guilty, comprised a major portion of the government's proof. Defendant sought to call as a witness the psychologist who examined Ambrosino in connection with the government's evaluation for the Witness Protection Program. The court barred defendant from calling her as a witness. Defendant moves to set aside the verdict on the ground, among others, that he was denied an opportunity to present a defense. The case against defendant's position is patently clear. Yet it was so strongly urged that a brief analysis is warranted.

## I. FACTS

### A. *Trial and Conviction of Defendant*

A jury found defendant guilty of racketeering and racketeering conspiracy in connection with the activities of a criminal organization, the Colombo crime family. 18 U.S.C. §§ 2, 892, 894, 924(c)(1), 1959(a) and 1962(c) and (d).

Defendant's responsibility was to supervise a "crew" which committed crimes to generate proceeds for the criminal enterprise. Joseph Ambrosino was assigned to defendant's crew. Ambrosino became a target of a government investigation of the affairs of the Colombo organization. After his arrest in June of 1992, he became a cooperative witness as part of a plea bargain.

Much of the government's case against defendant was the fruit of Ambrosino's cooperation. He occupied the witness stand for almost three full days. He provided a lengthy and detailed account of defendant's role in the Colombo organization and the offenses charged. In addition, the jury heard tape recordings made by the government containing conversations that took place in Ambrosino's car about defendant's extensive involvement in the crimes charged.

Defendant's able counsel witheringly cross-examined Ambrosino for more than a day. He delved deeply into numerous matters affecting credibility, such as Ambrosino's extensive criminal conduct, brutality, drug use, repeated perjury and general unreliability. Other witnesses established Ambrosino's propensity to lie and exaggerate. His plea bargain provided a strong motive to support the government's case in return for a lighter sentence and favored treatment in the Witness Protection Program. He was biased against defendant, who had abused him. In short, his impeachment was a classic example of the value of cross-examination. That the jury ultimately credited his testimony reflects the strength of the corroborative evidence of guilt.

## B. Psychological Evaluation of Ambrosino

Ambrosino had sought protection under the Federal Witness Protection Program. As a candidate, he was required to submit to a psychological examination. The examination was conducted over two days in September 1992 by a psychologist retained by the government. According to this psychologist's report, the purpose of the examination was to "assist the [Federal] Office of Enforcement Operations in determining the suitability of this candidate for placement in the Witness Security Program."

The psychologist's examination consisted of seven components: the Rorschach Inkblot Test, a personality measure; human figure drawing, a means of evaluating thinking processes and emotions; self-directed search, a means of measuring working skills; the Minnesota Multiphasic Personality Inventory, a series of 37 questions dealing with personality traits; the Bender Gestalt Test, which measures visual-motor coordination and is used to rule out brain damage; the Wechsler Adult Intelligence Test Revised, a standard intelligence test; and a clinical interview covering the subject's history and background.

During the evaluation, Ambrosino denied any history of psychological treatment and denied ever having "abused" alcohol or drugs. The psychologist summarized her findings and conclusions in a written report. She found him "cooperative, relaxed and verbal" and "logical and coherent." His memory functions were described as "above average" with no evidence of brain dysfunction. His I.Q. was "in the low average range."

The psychologist determined Ambrosino's "social intelligence" to be "below average." Not surprisingly, she found that this professional hoodlum "lacks an understanding of the norms and ethics that regulate society" and that his thinking could be described as "simplistic and concrete." Ambrosino, she noted, "tended to endorse items indicative of antisocial behavior such as the promotion of delinquent acts (lying, stealing, and superficial relationships)." Despite these problems, in her view, he "took an open and honest approach to answering questions asked of him" and did not "appear to be invested in minimizing or enhancing his perceived faults."

The psychologist observed that Ambrosino "does not appear to display any signs of a thought disorder or a mental illness." She did find that he "appears to have a paranoid orientation toward life," which she attributed in part to his high security status. She found him to be "experiencing some feelings of depression, anxiety and pessimism about his future."

The psychologist concluded her report by offering her forecast about Ambrosino's participation in the Witness Protection Program. She stated that since Ambrosino "has a history of breaking rules and not learning from his mistakes, it is unlikely that he will follow the program's rules." She also concluded that since he "has a long child and adult criminal history, it is likely that he will commit a crime again" and that, because of his "history of aggressive and impulsive behavior," he could be violent again in the future. Aside from her own testimony, the psychologist was not present for any part of the trial.

## C. Proffered Testimony of the Psychologist

Pursuant to court order, the government provided defendant with a copy of the psychologist's report. Defense counsel used the report in his extensive cross-examination of Ambrosino.

Because his attack on Ambrosino's credibility was so important to his defense, defendant also sought to call the government's psychologist as part of his own case to demonstrate Ambrosino's lack of credibility. The government objected, in part on the ground that this would violate Ambrosino's psychotherapist-patient privilege. The psychologist was heard at a voir dire outside the presence of the jury in order to determine her testimony's probative value and the nature of the privacy interests implicated.

In response to questioning by defense counsel, the psychologist stated that her

conclusions were based upon her experience and training. She restated many of the findings in her report. She said that Ambrosino was very high on the scale for "antisocial behavior" and had a strong tendency toward delinquent acts such as lying, cheating and stealing. She reiterated her view that he probably would not be able to follow the rules of the Protection Program, that he is likely to commit a crime again and that it cannot be ruled out that he will be violent in the future.

Defendant then offered the psychologist's testimony as relevant to the credibility and bias of Ambrosino. Among other purposes, defendant sought to use the expert's testimony to impeach Ambrosino on the ground that Ambrosino's story on the stand that he had renounced forever his life of crime was contradicted by the psychologist's finding that he was likely to commit crimes again. Defendant also wished to demonstrate Ambrosino's bias by using the report to show that Ambrosino had a motive to testify falsely—a final renunciation of his criminal past would help him gain entrance to the Witness Protection Program and save him from prison.

In answer to the court's inquiry, the witness acknowledged that she could express no scientifically based view of the truth of Ambrosino's testimony at the trial. She also expressed grave doubts about the capacity of people trained as she was to be helpful to the court on the subject of credibility in the courtroom. It was her conclusion that neither she nor others doing the work she did should be considered experts on witness credibility. Moreover, it was her view that the possibility that she might be required to assess the credibility of a person she had interviewed for another purpose would inhibit her in performing her function outside the courtroom.

## II. LAW

### A. *Expert Opinion Testimony*

The leading case on the admissibility of expert testimony was once *Frye v. United States,* 293 F. 1013 (D.C.Cir.1923). In *Frye* the defendant offered the testimony of an expert on the results of a systolic blood pressure deception test or "lie detector." The court held that such evidence should not be admitted. The accepted wisdom is that the pre-Federal Rules of Evidence *Frye* court rejected the lie-detector test on the ground that, at that time, the test was not "sufficiently established to have gained general acceptance in the particular field in which it belong[ed]." *Id.* at 1014. In fact, as explained below, routine exclusion of lie-detector tests is based today more properly on public policy rather than on lack of either relevancy or of general acceptance.

The Federal Rules of Evidence now permit opinion testimony by qualified experts when "scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue." Fed.R.Evid. 702. With Rule 702, the drafters rejected the broader implication of the *Frye* test in favor of a rule of helpfulness to the jury— a general standard of relevancy under Rules 401 to 403 of the Federal Rules of Evidence. *See, e.g., United States v. Jakobetz,* 955 F.2d 786, 794 (2d Cir.), *cert. denied,* —— U.S. ——, 113 S.Ct. 104, 121 L.Ed.2d 63 (1992); *United States v. Downing,* 753 F.2d 1224, 1229–30 (3d Cir.1985). Expert opinion testimony is admissible "if the probativeness, materiality, and reliability of the evidence outweighs its tendency to mislead, prejudice, and confuse the jury." *Jakobetz,* 955 F.2d at 794; *see also* Fed.R.Evid. 403 (probative evidence may be excluded if value is outweighed by danger of unfair prejudice, confusion or misleading of jury). While particular considerations may advise against admission, the general rule is that if the evidence is relevant and helpful the jury should not be denied its assistance in arriving at a sound verdict.

### B. *Expert Testimony on Credibility*

Evidence bearing on the credibility of a witness is encompassed comfortably within the broad rule of relevance of the Federal Rules of Evidence. *See also* Fed.R.Evid. 608 ("credibility of a witness may be attacked or supported by evidence in the form of opinion...."). As Wigmore ob-

served, the view that an expert should not be permitted to "usurp" a function of the jury in assessing credibility or otherwise is "empty rhetoric." 7 John H. Wigmore, *Evidence* § 1920 (Chadbourn rev.1978). *But see United States v. Scop,* 846 F.2d 135, 142 (2d Cir.1988) ("credibility of witnesses is exclusively for the determination by the jury"); *United States v. Cecil,* 836 F.2d 1431, 1441–42 (4th Cir.), *cert. denied,* 487 U.S. 1205, 108 S.Ct. 2846, 101 L.Ed.2d 883 (1988) ("a psychiatrist may not testify to the credibility of a witness; that issue is for the jury"). An expert cannot deprive a jury of its authority to determine facts because a jury always retains the power to reject the expert's view. Nor is it sensible to preclude an expert's testimony on a question of fact on the ground that it goes to "the very issue before the jury." Wigmore, *supra,* § 1921. A jury does not lose its ability to critically evaluate an expert's opinion simply because that opinion touches an "ultimate" question. Rule 704 of the Federal Rules of Evidence rejects the ultimate-issue rule except in limited circumstances not here relevant.

■ No clear distinction can be made between what is "ultimate," often referred to as a "material element," and what is not. Credibility, for example, is not an element of any crime with which defendant is charged. In many cases, however, credibility of the defendant and other witnesses largely determines the jury's verdict because it affects the probative force of testimony directly relevant to a material element. The only legislatively established limitation on how far upon the jury's "province" an expert may tread relates to the mental state of the defendant. Fed.R.Evid. 704(b).

The Court of Appeals for the Second Circuit has recently suggested that "expert witnesses may not offer opinions on relevant events based on their personal assessment of the credibility of another witness's testimony." *Scop,* 846 F.2d at 142. In *Scop,* the court stated categorically that "even expert witnesses possessed of medical knowledge and skills that relate directly to credibility may not state an opinion as to

whether another witness is credible." *Id.* It is obviously too broad a statement. For example, if a medical expert could testify that due to a brain tumor the witness could not remember or observe what he said he remembered or observed it is unlikely that such testimony would be precluded on the ground stated in *Scop.* It seems doubtful that the Court of Appeals intended to apply such a sweeping rule of preclusion, which was not necessary to its decision in *Scop,* to its fullest possible extent. Judge Pierce, in refusing to endorse this unnecessary statement of the majority expressed the more careful and sounder view of the matter under the Federal Rules of Evidence. *Id.* at 143–44 (Pierce, J., concurring); *see also United States v. Pacelli,* 521 F.2d 135, 140 (2d Cir.1975) ("Whether or not psychiatric testimony is admissible to impeach the credibility of a witness is within the discretion of the trial judge."); *United States v. Rohrer,* 708 F.2d 429, 434 (9th Cir.1983) ("Although the credibility of a witness, unlike his competency, is a question for the jury, admission of expert psychiatric testimony bearing on credibility lies in the judge's discretion...."). Professor Margaret A. Berger, in her comprehensive discussion of the issue, demonstrates that Judge Pierce was correct. *See* United States v. Scop: *The Common–Law Approach to an Expert's Opinion about a Witness's Credibility Still Does Not Work,* 55 Brooklyn L.Rev. 559 (1989) (criticizing *Scop* and citing authority). The broadest aspects of *Scop* are inconsistent with the objectives of the Federal Rules of Evidence and the Court of Appeals' own reading of those rules in *Jakobetz,* 955 F.2d at 786.

■ The critical aspect of the test for opinion testimony, which "is never to be lost sight of," is that the rule is and must be "a flexible, living one." Wigmore, *supra,* § 1926. Wigmore described the analysis as follows:

[T]he only true criterion is: On *this* subject can a jury receive from *this person* appreciable help? In other words, the test is a relative one, depending on the particular subject and the particular witness with reference to that subject, and

is not fixed or limited to any class of persons acting professionally....

*Id.* § 1923 (emphasis in original). Credibility assessment by a competent witness can be both relevant and highly probative. The appropriate determination will depend upon the witness's qualifications, what the witness has to say, possible prejudice, public policy and the problem confronting the jury in the particular case.

In *Frye,* for example, the question was the admission of lie-detector evidence to establish that the defendant was telling the truth. Given the well known phenomenon that lying is tension-provoking for some people at some times, a precise measurement of that tension through blood pressure and other criteria could be at least as helpful as the methods often relied upon by jurors—sweaty palms, refusal to look squarely at the jury or general unease. (In the instant case the attorney for the defendant stressed in his closing argument Ambrosino's failure to look at the jurors when testifying as an indication of lying.)

The *Frye* court refused the proffered testimony ostensibly on the ground that the test was insufficiently reliable. The *Frye* result, however, now more properly hinges on general policy than upon relevance and reliability. If courts were to permit lie-detector evidence of credibility generally, we would face the intolerable effect of potentially requiring the testimony of every defendant and every witness to be bolstered or attacked with lie-detector analysis. Jurors would come to expect such tests or an explanation of why the lie detector was not used. Considerations of wastefulness of resources, potential invasion of privacy and excessive reliance on a technique easily susceptible of abuse support a strong public policy against lie-detector evidence. So, too, does the likelihood that the results would often be overvalued by the jury because of the seeming mechanical verisimilitude of these results when in fact their effective use depends upon the operator, the person taking the "test" and analysis by an expert. The *Frye* court, under present rules of evidence, could have justified its ruling under Rule 403 rather than under Rules 104(a)

(court determines preliminary questions of qualifications of witnesses and of privileges), 401 (standard of relevancy), 402 (relevant evidence admissible), 608(a) (opinion evidence on credibility of witness), 702 (testimony of qualified experts admissible if helpful to trier of fact), 703 (factual bases for testimony of expert) and 704(a) (opinion testimony not objectionable because it embraces "ultimate" issue).

### C. *Testimony of Psychologists and Psychiatrists on Credibility*

The testimony of psychologists or psychiatrists concerning a witness's credibility is in somewhat the same category as lie-detector tests except in a narrowly circumscribed group of special situations.

The *Hiss* case was a rare example of proof of a medical predicate for a finding of inability to differentiate between truth and falsehood. At his perjury trial, Alger Hiss confronted his chief accuser, Whittaker Chambers, who claimed that Hiss had provided government secrets to the Soviet Union. *See United States v. Hiss,* 185 F.2d 822 (2d Cir.1950), *cert. denied,* 340 U.S. 948, 71 S.Ct. 532, 95 L.Ed. 683 (1951) (describing Hiss's trial and Chambers' role). Hiss was permitted to present the testimony of a psychiatrist who had observed the testimony of Chambers for the purpose of impeaching Chambers. *United States v. Hiss,* 88 F.Supp. 559 (S.D.N.Y. 1950). The court ruled that "[e]vidence of insanity is not merely for the judge on the preliminary question of competency, but goes to the jury to affect credibility." *Hiss,* 88 F.Supp. at 559.

In *United States v. Partin,* 493 F.2d 750 (5th Cir.1974), the court distilled from *Hiss* the broad principle that "the jury should, within reason, be informed of all matters affecting a witness's credibility to aid in their determination of the truth." *Id.* at 762. This principle stemmed from the general rule that "the defendant has the right to explore every facet of relevant evidence pertaining to the credibility of those who testify against him." *Id.* at 763. In *Partin,* however, the court was not compelled

to test the limits of these broad propositions. The court ruled that the trial judge had committed error in barring the defendant from offering two types of evidence: cross-examination of a witness on the basis of records of the witness's admission to a Veterans Administration hospital, which the witness had denied, for mental treatment at the time of the events in question; and the opinion of a psychiatrist who examined those records and concluded that the witness suffered from mental illness at the time. A jury often should be made aware that a witness was mentally ill at the time of the events about which the witness testifies since ability to observe and remember may be implicated. The problem in *Partin* was one of capacity for perception and recollection rather than one of veracity based on desire and ability to tell what the witness actually is recollecting.

In *Lindsey v. United States*, 237 F.2d 893 (9th Cir.1956), a fifteen-year-old complainant in a rape and sodomy prosecution testified against the defendant. On cross-examination, the defendant introduced letters and an affidavit in which the complainant retracted her original charges. To rehabilitate her, the government called a psychiatrist who was permitted to state that on the basis of a clinical examination that included a sodium-pentothal or "truth-serum" test, his professional opinion was that she was telling the truth when she repeated her original charges on direct examination. The jury also was permitted to hear a tape recording of the "truth-serum" interview after the psychiatrist had testified to the substance's effects and the test's reliability.

The trial judge was reversed. The court based its ruling on two related grounds. It held that evidence of the contents of the interview could not be admitted to rehabilitate the complainant's testimony since she was a government witness at the time of the examination and therefore had the same motive to fabricate then as she had at trial. *Id.* at 895; *see* Fed.R.Evid. 801(d)(1)(B). The court also stated that, under *Frye*, the "truth-serum" test was not sufficiently established and reliable to overcome the problem of motive. *Lindsey*, 237

F.2d at 895–96. The *Lindsey* result hinged on considerations of the rehabilitation rules and serious doubts about the value of the proffered scientific technique—"truth serum"—on the question of credibility. It was fully justified by the current rules of evidence and policy considerations similar to those applicable to lie-detector tests.

■ These cases as well as principle compel the conclusion that a psychologist's opinion on a witness's credibility can be useful to a jury under Rule 702 in some circumstances but not in others. In addition, independent considerations of prejudice, public policy, a defendant's and witness's constitutional rights and other evidentiary principles must be taken into account. As Wigmore observed, the expert opinion rule is a flexible one requiring careful application by the trial court of rules and policy to the facts of the case before it. An appropriate determination under the scheme of the Federal Rules is one shaped to the contours of the situation rather than one based upon rigid preconceptions about a jury's "province," "ultimate" questions, "general acceptance within the field" and the like.

## III. APPLICATION OF LAW TO FACT

■ The psychologist's testimony here would not have been helpful to the jury in evaluating Ambrosino's credibility. She told the court that she had not heard his testimony and was not qualified in any event to opine on a witness's veracity in court. *See* Fed.R.Evid. 702 and 703. The observations and conclusions in her report indicated that she viewed Ambrosino as forthright and honest during the interview. She neither said, nor could have said, any more about his credibility. To the extent the report evidenced prior inconsistent statements by Ambrosino, defendant was able to utilize the inconsistencies on cross-examination. Absent some particular showing of relevance, a psychologist such as this one has no special expertise that would assist a jury in deciding the credibility of a witness she had interviewed for another purpose.

That the psychologist's opinion would not have helped this jury is clear from the nature of the trial. The jury was in a far better position to measure Ambrosino's credibility than was the psychologist. They had almost three full days to observe and evaluate the substance of Ambrosino's testimony and his demeanor. More than a full day of that time was occupied with cross-examination covering numerous aspects of Ambrosino's criminal past and his history of lying to others, under oath and otherwise. Defendant was permitted to exercise to the fullest extent his constitutional right to confront his accuser. It is a fair inference that the jury convicted defendant not because they concluded that Ambrosino had no propensity to lie, but because the corroborating evidence persuaded them beyond a reasonable doubt that he was telling the truth on this occasion, at least with respect to the key elements of the crimes with which defendant was charged. His testimony had to correlate with an enormous amount of other testimony, documents, real proof such as ballistics and fingerprint evidence, and bugs and wiretaps recording conversations.

In addition to having little or no probative value, admission of the psychologist's testimony would have contravened public policy. *See* Fed.R.Evid. 104 and 403. As the Court of Appeals for this circuit observed in *In re Roe,* 964 F.2d 1325 (2d Cir.1992), the trial court must consider the privacy interests at stake in admitting the testimony of a psychotherapist. Not only are the privacy rights of an individual such as Ambrosino potentially threatened, but the public interest also is implicated. People should be encouraged to speak fully and candidly with psychologists. Psychologists depend upon open communication to accomplish their valuable purpose of evaluating and improving the mental health of individual members of society. These considerations are particularly applicable where the government must make the difficult decision whether to accept a person into the Witness Protection Program. The determination that a person can or cannot succeed in this important program, and therefore the viability of the program it-self, depends upon the government's being able to procure from experts complete and accurate information about candidates for admission.

For similar reasons, such testimony should not be permitted on the question of bias. This psychologist could not have helped the jury determine what motives Ambrosino might have had for testifying falsely. The jury saw and heard him testify and she did not. They heard the extensive cross-examination probing into possible motives, including Ambrosino's conflicts with defendant and his desire to avoid prison and enter the Witness Protection Program. The psychologist would have added little or nothing to the materials already before the jury. Just as she had no special expertise on the question of credibility, she had no special expertise on the question of bias. The jury knew as much as she did about Ambrosino's desire to enter the Witness Protection Program. Considerations of public policy, prejudice and probative force relating to psychological examinations apply with respect to bias as well as to credibility.

Every factor counsels against the admission of this psychologist's opinion about Ambrosino's credibility and potential bias.

## IV. CONCLUSION

Because the psychologist's testimony would not have been helpful to the jury and good policy advised against its admission, defendant was properly barred from offering it.

SO ORDERED.