Irvin DAVIS

v.

UNITED STATES STEEL
CORPORATION.

Civ. A. No. 79–4390.

United States District Court,
E. D. Pennsylvania.

Feb. 26, 1982.

Michael Churchill, Philadelphia, Pa., for plaintiff.

Thomas Preston, Philadelphia, Pa., for defendant.

MEMORANDUM

NEWCOMER, District Judge.

Plaintiff Irvin Davis alleges intentional racial harassment during his employment with defendant United States Steel Corporation. The following comprises findings of fact and conclusions of law pursuant to Fed.R.Civ.P. 52.

## I. Jurisdiction.

Plaintiff's claims are based on 42 U.S.C. § 1981 and Title VII, 42 U.S.C. § 2000e et seq., and jurisdiction lies in this Court. At trial plaintiff's claims under Title VII were dismissed as having been untimely filed after plaintiff's receipt of his Right to Sue letter.

## II. Findings of Fact.

The subject of plaintiff's grievances against defendant has been litigated in part before, pursuant to the collective bargaining agreement between the United States Steel Workers and defendant,[1] and in part during the trial of Dickerson v. U.S. Steel Corp. (Dickerson I), 439 F.Supp. 55, 89 (E.D. Pa.1977), where I found that plaintiff had presented a prima facie case of harassment.

The arbitrator found "In his testimony grievant alleged that discrimination of supervisors and other employees motivated the evaluation of his performance. The record does not support this contention." (Exh. USS–10 at 8).

Irvin Davis was hired by defendant in 1968 as a laborer. Late in 1968 plaintiff began to undergo treatment for mental illness. The parties agree that he suffers from a schizo-affective disorder. The evidence is that this disorder renders him unusually sensitive to criticism or adversity. Thus, he is unusually vulnerable to racial slurs, but he is also likely to perceive excessive criticism or a racial slur where none is intended. Defendant has been aware of this condition since 1969. In 1972 the company was specially advised by plaintiff's physician that plaintiff was seriously ill.[2]

---

1. Allegations made by the union included "continual harassment" and "a discriminatory attitude and practice" on the part of defendant. (Exh. USS–10 at 5).

2. "He suffers from Schizophrenia.... He is

The physician recommended in September of 1972 that plaintiff be assigned to work shifts only during the day. Dr. Joseph Koch, who was the Fairless Hills plant medical director, inquired of management about assigning plaintiff only to day work. Dr. Koch was told that it would not be feasible.

Dr. Koch saw plaintiff regularly, and I find that he took special pains to care for plaintiff. I am impressed by Dr. Koch's concern for plaintiff, which is evident from both his testimony in Court and from what the record shows of his efforts on plaintiff's behalf.

Later in 1972 plaintiff passed the apprentice test battery. The selection group for the apprenticeship program was divided on the question of his admission to the program. Plaintiff's attendance record at work was one of the worst in the Pipe Mill division and his performance record was not good. Nevertheless, Richard Dierker, Division Superintendent in charge of the Pipe Mill, exercised his authority to transfer plaintiff to the apprenticeship program. Dierker hoped that a measure of success would give plaintiff incentive to perform better. Plaintiff's progress in the apprentice program was dismal. He was absent for a major portion of the required classroom work, and he repeatedly violated work rules. One work rule that plaintiff flouted especially often was the rule that he remain in his work place unless specifically permitted to leave. The foremen who have testified convinced me of the importance of this rule, and it is easy to comprehend how frustrated they must have been when constantly plaintiff would wander away from his assigned place. That fact illuminates one incident over which much has been made. When Paul Walker, a foreman, found plaintiff away from his assigned job, which was a job requiring extreme speed and diligence on the part of the pipefitters, he criticized and disciplined plaintiff. Plaintiff says that he had been given permission by the craftsman with whom he

was working to leave the work area to smoke a cigarette, and this testimony is corroborated. This is the single unfair criticism of plaintiff's work performance that I can find. Under the circumstances, I cannot fault Mr. Walker for leaping to the conclusion that plaintiff had, yet again, left his work area. But I do not consider here allegations of unfair labor practices. My sole concern is racial harassment. I can find none in this incident.

The evidence is quite clear on two points. First, plaintiff had a miserable work record, and second, a number of people have repeatedly interceded on his behalf in order to obtain for him special treatment. The minutes of the civil rights committee are full of the problems of "I. Davis" and Messrs. Henry, Cardos, and Johnson appear on the record negotiating on his behalf. These three men have repeatedly asked supervisors to overlook plaintiff's transgressions. The representatives of the company seemed hardly less eager to solve plaintiff's problems. One sad fact is, however, that Dr. Koch, who quite correctly never revealed what any doctor would consider confidential information, could never fully communicate to plaintiff's supervisors the extent of plaintiff's mental illness. Whether that would have made any difference is doubtful, however. Steel plants are not sanatoriums, and I doubt that Mr. Foust and Mr. Walker, even if forewarned, have the training and ability to cope with an apprentice with plaintiff's unfortunate mental condition.

The facts I find today are tragically consistent. Plaintiff is an emotionally disturbed man who perceived discipline as harassment, and who reacted against the discipline in ways that merely aggravated his supervisors, who in turn saw in these reactions further rebellion. This regretful synergy is devoid of racial overtones. The only unfairness with any support in the record is that defendant was not sufficiently careful with plaintiff, that it did not treat him as gently as his condition required.

not dangerous in any way but at times he just does not have the ambition to come to work."

(Exh. USS 27 at 20. Letter of Alfred J. Strauss, M.D.).

As I have found, defendant took extraordinary steps to help him, as did many individuals, and if called upon to rule on that alleged unfairness, I would concur with the arbitrator.

I am required, however, to analyze the evidence for any sign of racially motivated harassment or discriminatorily imposed discipline. I can find neither. The only mention of race was a specific assurance to plaintiff by a foreman that plaintiff's religion, Islam, was not an issue. There is an allegation that plaintiff was once called "boy," which is a patently racial slur in most contexts. The evidence of the context, or even that the word was used, is so inconclusive as to render it meaningless, however. This does not mean that the slur, if uttered, was inconsequential. Quite to the contrary. If I were convinced that it had been used and that it had been intended as a racial slur I would weigh that heavily against defendant. Instead, I find that the proof of the statement and the proof surrounding the statement is insufficient to support plaintiff's burden of proof. This finding is supported by the evidence that a black apprentice named Pressley, who started in the program at the same time as plaintiff has had no similar difficulties with the same foremen and supervisors.

### III. Conclusions of Law.

Having found no evidence of intentional racial harassment or discrimination, I conclude that judgment must be entered for defendant and against plaintiff.

An appropriate order will be entered.