**Renee L. PASCOUAU, Plaintiff,**

v.

**MARTIN MARIETTA CORPORATION, a Maryland Corporation doing business as Martin Marietta Astronautics Group, Defendant.**

**Civil Action No. 93–K–471.**

United States District Court,
D. Colorado.

Feb. 19, 1998.

David C. Feola, King Minnig Clexton & Fcola L.L.C., Denver, CO, for Plaintiff.

Lee Dale, Sherman & Howard L.L.C., Denver, CO, for Defendant.

## MEMORANDUM OPINION AND ORDER

KANE, Senior District Judge.

This case is before me on Plaintiff's claims of discrimination in her employment based on gender and sexual harassment including a hostile environment, *quid pro quo* subjection, retaliation, unequal pay and promotion, and promissory estoppel. All of these claims fall within Title VII of the Civil Rights Act of 1964 (the Act) and the unequal pay and promotion claim also falls within the Equal Pay Act (29 U.S.C. § 206(d)(1)). The Title VII claims arise before the 1991 amendments to the Act. (42 U.S.C.2000e *et seq.*) Jurisdiction based upon federal statutory law is not contested.

### I.  *SUMMARY.*

Plaintiff claims she suffered damage because agents and employees of Defendant, including her supervisors, sexually harassed her over a lengthy period when she was an employee in a Document Control Unit. During this period and at its closure, she claims she was denied promotion and raises based on her gender, demoted for the same reason and finally constructively discharged from her employment. She alleges she relied on and followed Defendant's procedures and representations to her detriment in reporting sexual harassment and reasonably relied on Defendant's representations of no retaliation and prompt and appropriate corrective action. She claims she reported the harassment to her immediate supervisor, who failed to take any action, and to department of human resources personnel and higher echelon supervisors who failed to take appropri-

ate remedial action and retaliated against her by means of transfer and demotion and through actions that adversely affect her security clearance.

Defendant denies Plaintiff's allegations in their entirety. It denies Plaintiff was subjected to unwelcome sexual advances or conduct of a sexual nature that created a hostile working environment or interfered with her ability to perform her job. It avers that jokes and language of a sexual nature were not found to be objectionable by Plaintiff and that she willingly participated in the conduct she later complained of, leading her coworkers to believe such conduct was not unwelcome. Moreover, Defendant states that when Plaintiff and at least one other female employee complained, appropriate corrective action was taken.

Defendant denies any gender discrimination took place with respect to Plaintiff's terms and conditions of employment, including transfer and promotion. It states her transfer was motivated by business and economic considerations and that Plaintiff was laid off only after declining an offered position. Finally, Defendant asserts Plaintiff never performed equal work for unequal pay; she performed only some of a male employee's duties when she was temporarily reassigned in his absence.

Defendant also asserts that evidence acquired in this litigation through discovery establishes Plaintiff would not have been retained in any classified or restricted access program. Therefore, Defendant claims Plaintiff cannot recover damages for actions arising during her employment in positions requiring security clearance. Defendant asserts Plaintiff concealed her history of drug use and emotional instability which preclude recovery even if she were able to establish violations of Title VII.

Based on the evidence adduced at trial and my determination that Plaintiff lacks credibility, I find in favor of Defendant on all issues.

### II.  *FACTS AND PROCEDURAL HISTORY.*

#### A.  *Significant Employment Dates.*

On November 8, 1982, following a four-year tour with the U.S. Navy, Plaintiff was

hired by Defendant as a Word Processor II. On March 14, 1983, she was promoted to Math/Statistics, Clerk II. On February 27, 1984, Myron Timmons was promoted to labor grade 24 and transferred to Program Security as a Clerical Analyst II. On September 10, 1984, Plaintiff was promoted to Operator–Word Processor at labor grade 23. On October 19, 1987, she was transferred to the Program Security Department and promoted to Clerical Analyst Security, labor grade 24. Initially, Plaintiff worked on a government funded project called the P–716 Program. In approximately June, 1988, she transferred to the Document Control Unit of Defense Systems. It was in this Unit that she alleges she was subjected to sexual harassment and discrimination.

In July 1988, Plaintiff and five other employees began a temporary assignment in Florida. In September she received a yearly performance evaluation rating of "expected" and attached a statement to the evaluation protesting the rating as undeservedly low. In mid-December she returned from the temporary duty assignment.

In July 1989, Plaintiff received a yearly evaluation rating of "excellent." She complained that the rating should have been the highest available, "outstanding," and expressed hope that in the next year someone would notice her good work.

In January 1990, Myron Timmons, now a Security Specialist at labor grade 43, was temporarily assigned to another facility and Plaintiff took over some of his auditing duties. In March another coworker, Bob Garlington, was promoted to Tech Data Processor II at labor grade 35. On April 2 and 9, Plaintiff and another employee, Bill Gallagher, complained to a supervisor, J.D. Fleshman, about Plaintiff's lack of promotion and other problems in the Document Control work area.

From April 9 through April 24, Plaintiff's immediate supervisor, Dan Engle, held individual meetings with Document Control personnel and discussed appropriate workplace behavior with them. On June 4, 1990, Plaintiff was promoted to Clerical Analyst Program Security I at labor grade 26. On October 1, 1990, Myron Timmons began a military leave of absence in connection with Operation Desert Shield. He returned on March 26, 1991. On March 27, 1991, Plaintiff was removed from the Document Control Unit by a procedure known as "offloading" and returned to her "home shop," the Central Unit of Program Security.

On April 1, 1991, Plaintiff filed a complaint of discrimination with the Martin Marietta Equal Employment Opportunity Department. Ten days later she was offered a position in her "home shop" with a labor grade of 24 and no loss of pay. On April 15, she declined the transfer and was advised she would be laid off. On April 29, 1991, Plaintiff was laid off from her employment with Defendant.

On July 8, 1991, Plaintiff filed a complaint with the United States Equal Employment Opportunity Commission. In September 1992, EEOC personnel interviewed Martin employees and obtained affidavits. On November 17, 1992, the EEOC issued Plaintiff a Right To Sue letter. This action was filed on February 26, 1993, and assigned to then Chief Judge Finesilver. On September 1, 1993, Defendant learned that Plaintiff had admitted on hospital intake forms in connection with psychiatric treatment significant prior drug usage that directly contradicted security clearance application forms she had previously submitted while working for Defendant.

### B. *Plaintiff's Psychological Profile.*

Plaintiff offered expert testimony from Dr. Harvey Powers, a psychologist, and Defendant presented expert testimony from Dean Plazak, M.D., a psychiatrist. Other testimony and documentary evidence related to Plaintiff's mental status. In sum, I find Dr. Plazak's testimony and opinions to be persuasive and reject Dr. Powers' opinions contrary thereto.

Dr. Plazak found Plaintiff suffers from two psychiatric disorders. The first, both in time and degree, is a type called mixed personality disorder with borderline histrionic and narcissistic characteristics. The second is a recurring major depression, elements of which have been present in the Plaintiff since she was eight years old.

The personality disorder is a condition, largely the product of being raised in a dysfunctional home with dysfunctional parents, in which Plaintiff did not learn how to solve problems effectively or to communicate effectively with other people. The disorder leads to the formulation of implausible perceptions and thus different kinds of conclusions about what other people's actions and behavior mean as distinguished from what a reasonable person not subject to such a disorder would perceive them to mean.

Consistent with this disorder, Plaintiff makes judgments that are highly personalized and overly emotional. She sees things in black and white terms rather than shades of gray that permit allowances and generally feels whatever goes wrong is someone else's fault and she had no role in the misadventure. Persons with this disorder take no personal responsibility for what goes wrong in their lives.

Dr. Plazak opined, and I so find, that Plaintiff also displayed symptoms which fall within the borderline personality disorder. The essence of Plaintiff's complaints in this case is the product of Plaintiff's "splitting," a psychiatric term meaning the patient initially over-evaluates and over-values other people, and then, when the slightest thing goes wrong, demeans those people and becomes angry and upset with them. The major affective characteristic is anger or rage. Secondarily, such a person is fearful of being abandoned or not being liked and does not want to be alone. As a result, the borderline personality very often gets involved in unsuccessful intimate relationships. Depression frequently accompanies the personality disorder because the unsuccessful outcomes of interactions with other people lead to prolonged disappointment.

Dr. Plazak found that Plaintiff had an additional major depression over the years based upon other causes or stressors. He found in Plaintiff's hospital records and in his examination of her that she had made suicidal gestures or attempts and engaged in other unwise activities, such as overspending and involvement in multiple unsuccessful intimate relationships.

Dr. Plazak also diagnosed Plaintiff with a posttraumatic stress disorder subcategorized as a "childhood type." This diagnosis differs most markedly from Dr. Powers' evaluation and in my view is a decisive reason to place more credence in Dr. Plazak's opinion. Dr. Plazak states Plaintiff suffers from a childhood type post traumatic stress disorder. To be so its cause, or stressor, occurring in childhood, must have the quality of being life-threatening. Plaintiff experienced such an incident when she was eight years old. She was forced into a family car with her sister by her mother at knife point and clearly believed her mother intended to commit suicide and take her and her sister with her by driving off a bridge. Her mother in fact drove off the bridge, but no one was killed. Plaintiff suffered a fractured arm and, thereafter, showed classic symptoms of the childhood type post-traumatic stress disorder. Dr. Plazak opines, and I so find, that the symptoms of that disorder are still present and untreated.

When asked if Plaintiff's allegations had any role in the causes of Plaintiff's disorders, Dr. Plazak replied that the situation is reversed in that the disorders are causes of the allegations. The incidents Plaintiff related were characterized by misinterpretations of events and interactions with fellow employees that were far more intense than would be interpreted by a reasonable person. In Dr. Plazak's words, "That would be because the individual had been severely traumatized at some point earlier in life. There, however, were significant traumas which occurred after age eight also that contributed to that sensitivity."

On the contrary, Dr. Powers attributed all of Plaintiff's emotional difficulties solely to her experiences as an employee of Defendant. His conclusion dismisses the profuse psychiatric history of the Plaintiff which accounts for the symptoms she had displayed all her life and continued to display even at the time of trial.

The second area of disagreement between the experts, which I again resolve in favor of Dr. Plazak's testimony, concerns Plaintiff's use of drugs. Dr. Powers accepts Plaintiff's denial of drug use and Dr. Plazak rejects it. In numerous medical and hospital records, including separate histories given personally

by Plaintiff, are entries denoting illicit drug use. Dr. Plazak also observed, and I so found in examining the exhibits, that Plaintiff frequently omitted facts which she related elsewhere and then denied she had given some of this history at all. In one instance, Plaintiff produced records in which she had "whited out" an entry and then denied having done so.

## C. *Findings of Fact.*

### 1. *Sexual Harassment.*

■ While Plaintiff was assigned to the Document Control Unit, the male employees engaged in behavior which could have created a hostile working environment if carried on to the extent Plaintiff asserts. It is a matter of degree, and, based on the testimony of other female employees, I find that coarse language, joking and other inappropriate and immature behavior was not sufficiently severe to alter the conditions of employment or create an abusive working environment.

Among other practices about which there is no factual dispute, the male employees engaged in "farting contests." Some of the male witnesses describe this as "men's locker room humor." I think it is more accurately described as junior high school or pubescent behavior, but in any event I am not going to be the first judge to relate breaking wind to sexual behavior. I find it is offensive conduct irrespective of gender and does not give rise to a sexual harassment claim. I will leave it to some other court to ponder the profundities of this practice. It is of no matter, because when another female employee objected to this behavior to the supervisor, Mr. Engle, the practice stopped.

I find that the men in the Unit joked about their personal sex lives and commented on the physical attributes of women passers-by. They talked among themselves about going to strip tease clubs. There were so-called adult or "girlie" magazines in a drawer in Mr. Engle's desk. Mr. Engle testified the magazines were already in the desk which was moved into the Document Control area from another location and were there when he began his employment with Defendant. The magazines, however, were not displayed nor was Plaintiff subjected to viewing them.

At the request of his wife, one of Plaintiff's coworkers brought a "hybrid rubber plant" to the workplace. Apparently, the wife had given this novelty item to this employee as a gift. The "rubber tree" was a plastic tree to which miniature condoms were fastened. Rather than complain about the presence of this item on the premises, Plaintiff told its owner she thought it was cute.

There indeed were episodes of off-color joking that went on in the group and Plaintiff participated in them. Moreover, Plaintiff never complained to her supervisor or to higher level supervisors about these jokes. Plaintiff asserts she was called "Bumper" in reference to her breast size. However, at least one witness, Mitch Rolstad, testified credibly that he kidded with Plaintiff about the term "Bumper" on one occasion after he heard someone from outside the Unit joking with her and calling her "Bumper." Rolstad does not recall others using the term. Moreover, another female employee, Karen McGuckin, testified that Plaintiff openly joked about her own breast size with others, including male employees. At one point, someone derided Plaintiff by saying "her brains were in her boobs."

With respect to the use of vulgar language, I find Plaintiff and her coworkers used base Anglo–Saxon terms on occasion. Plaintiff never complained that such language offended her while she was in the Unit. As part of the totality of circumstances, this language was not considered offensive by Plaintiff at the time she was in this environment. As with other subjects, Plaintiff's present complaints amount to afterthoughts. I find that in their totality, the speech, jokes and conduct of the employees in the Document Unit were consistent with their level of education and experience and, as such, constituted a work environment that was not so severe and pervasive as to alter Plaintiff's conditions of employment so as to violate Title VII.

In April 1990, J.D. Fleshman was the manager of Human Resources for Defense Systems. Plaintiff met with him at that time and complained she was not being promoted or paid fairly in light of her assumption of Mr. Timmons' audit lead duties. Her complaints about the work environment were

secondary. She did not raise with him the specifics or the type of complaints she testified to in trial. As it so happened, Mr. Fleshman took appropriate action by advising Plaintiff's supervisors to correct the situation of which she complained. Thereafter, Plaintiff acknowledged in interviews with EEO representatives in April 1991 that Mr. Fleshman had taken appropriate action with regard to the work environment. She maintained, however, that he had not taken appropriate action with respect to her complaints about pay and promotion. Such is the crux of the controversy.

### 2. *Pay and Promotion.*

Plaintiff's main complaints about pay and promotion discrimination relate to the job duties of Myron Timmons. When Mr. Timmons was transferred, Plaintiff was assigned to some, but not all, of his duties. Plaintiff never performed nor was she assigned Mr. Timmons' managerial duties. She also claimed discrimination based upon the size of some of her coworkers' pay raises. It was Defendant's policy to achieve pay equity by providing larger percentage increases to lower-paid employees performing the same or similar work. These raises were made irrespective of the gender of the employees. Because Plaintiff was already being paid more than some of her coworkers, she did not benefit from this equity policy. On the other hand, she did not suffer merely because someone else did receive a benefit. Finally, in this regard, I find Defendant's policy is based on legitimate and genuine business reasons and is not a pretext for illicit discrimination or retaliation.

### 3. *Constructive Discharge—Removal from Document Control Unit.*

■ Defendant is primarily a defense contractor. As such it must react to cutbacks in federal funding and reallocate pay positions to funded projects. In some instances, cutbacks in federal funding require substantial reductions in Defendant's workforce. Those employees who cannot be reassigned, transferred or placed in a lower pay grade must leave the company's employment. More often than not employees accepted demotions and transfers due to cutbacks in funding and terminations of specific projects. The process of leaving a project or assignment is called "offloading." Plaintiff claims she was

"offloaded" for one, or both of the following reasons: either because of her sex or in retaliation for her earlier complaints to management. Defendant maintains she was "offloaded" from the Document Control Unit for legitimate, non-discriminatory reasons.

The decision to offload Plaintiff was made following the return of Myron Timmons from his temporary assignment and active duty with the U.S. military in connection with Operation Desert Storm. (The Persian Gulf crisis precipitated his call to active service during the time of his temporary assignment.) Defendant chose to retain Mr. Timmons because he was capable of performing both the clerical level audit duties temporarily assumed by Plaintiff in his absence and the management or "exempt" level duties Plaintiff did not perform. Plaintiff also asserted that a male employee, Bernie Logsdon, could have been offloaded from Document Control instead of her, but I find he was working in a temporary status and was already scheduled for offloading in the next few months. When he was offloaded, Mr. Logsdon, like Plaintiff, was offered another position. The difference is that he accepted the offer.

The other employee who could have been offloaded was female. She was not chosen for offloading based upon her long service and demonstrated interpersonal skills. One could surmise that Plaintiff's first-level supervisor, Mr. Engle, had reason to retaliate because of Plaintiff's initial complaints to Mr. Fleshman, but Mr. Engle had no role in the decisions to offload Plaintiff from Document Control or to terminate her employment after she refused the offered transfer.

Plaintiff's home shop, the Central Unit of Program Security, was managed by Glen Gates. He was instrumental in locating a position for Plaintiff in the Central Unit. The position would have reduced Plaintiff's labor grade from 26 to 24. It would not have resulted in a loss of pay. Plaintiff rejected this offer with full knowledge that doing so meant she would be laid off. She alleges these circumstances constituted a constructive discharge because of the demotion and because the new job would have required her to appear on occasion at the Document Con-

trol Unit from which she had been offloaded. She urges me to find that this assignment would have been so humiliating to her as to make the job intolerable. I find she cannot now complain because (1) she never raised this issue with Mr. Gates and, (2) if she had, Mr. Gates would have made accommodations for her. Moreover, during the few weeks that she did in fact serve in the Central Unit, she had no contact with her former colleagues in the Document Control Unit.

#### 4. Breach of Employment Contract/Promissory Estoppel.

■ Finally, there is no factual basis for a separate claim of breach of contract or promissory estoppel. The company's policy statements are no more than a restatements of its legal obligations imposed by statute. Plaintiff claims she placed specific reliance on a company policy entitled, "Reporting And Resolving Issues Of Harassment," on which she says she relied after reading it in a policy manual. Her actions, however, are inconsistent with reliance. The policy directs an employee to report incidents of harassment to either a supervisor or an EEO representative. Plaintiff, however, took her concerns to the Human Resources Department.

Throughout Plaintiff's medical records are numerous admissions she has made to drug use during her teenage years. She did not make similar disclosures in forms submitted to the government to obtain the security clearances essential to her employment in the Document Control Unit. In her trial testimony, Plaintiff denied the drug use and stated she put this information in the hospital forms in order to bring attention to her great need for medical/psychiatric attention. I find this explanation consistent with her other testimony in that it is constructed to meet the exigencies of the moment and lacks credibility.

It is undisputed that the federal government would not have granted Plaintiff a security clearance had it known of her significant drug use. Moreover, had it learned after granting a security clearance of the incomplete disclosures, the government would not have continued her security clearance. Had Plaintiff been truthful, she would never have been eligible to work with classified information in any of Defendant's endeavors. I specifically find that if defendant had known in 1991 of plaintiff's drug history and her avoidance and dissimulation with respect thereto, it would have terminated her employment.

### III. CONCLUSIONS OF LAW.

All of Plaintiff's claims lack substance. She is not a credible witness. As a woman, Plaintiff belongs to a protected group. I find her complaints are afterthoughts and that, for the most part, she consented to and participated in the comments, language and activities about which she now complains. Moreover, based upon the credible testimony of other women in the workplace and the lack of credible testimony by Plaintiff, I find the conduct that could be described as harassment was not based on gender, but rather on Plaintiff's demonstrated lack of interpersonal skills. Finally, I find the conduct was not sufficiently severe or pervasive to alter the terms, conditions or privileges of employment, nor did it create an objectively hostile or abusive working environment. See Harris v. Forklift Sys., Inc., 510 U.S. 17, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993); Meritor Sav. Bank v. Vinson, 477 U.S. 57, 106 S.Ct. 2399, 91 L.Ed.2d 49 (1986).

With respect to the alleged quid pro quo harassment, Plaintiff testified to only one episode and I do not find her testimony credible. She states Jack Bryant told her in 1988, in anticipation of the temporary duty assignment to Florida, that he was going to "corrupt" her. In any event, no corruption occurred and there was no change in the tangible aspects of Plaintiff's compensation, terms, conditions or privileges of employment. Nor was it established that either submission to unwelcome advances was an express or implied condition of receiving job benefits or that refusal to submit to a supervisor's sexual demands resulted in a tangible job detriment. See Hansel v. Public Service Co., 778 F.Supp. 1126, 1131 (D.Colo.1991).

Having concluded that Plaintiff was not subject to sexual discrimination or retaliation and that her complaints were dealt with appropriately, there is no basis for her claim for breach of contract or promissory estoppel. Moreover, Defendant's general policy statements are not sufficiently particular to

form the basis of a separate contract claim. *Vasey v. Martin Marietta Corp.*, 29 F.3d 1460 (10th Cir.1994). Lastly, because Plaintiff's actions did not comply with the company policy upon which she claims she relied, there would be no breach even if a contract were implied. The requirements of *Continental Air Lines, Inc. v. Keenan*, 731 P.2d 708 (Colo.1987), have not been met.

Plaintiff has failed entirely to prove a claim for constructive discharge. She was laid off for refusing a job. A reasonable person would not view the working conditions in the Central Unit as being so intolerable that an employee would have no other choice but to quit. That Plaintiff might have been subjected to contact with employees at her former assignment was not an intolerable condition. Moreover, had she complained, it is undisputed that accommodations would have been made to eliminate such contact. Thus, her other choice was to ask for a modification of her job assignment. Even assuming Plaintiff was the victim of sexual harassment at the Document Control Unit, the transfer to a new work environment would have been a reasonable, remedial measure.

Finally, I conclude Plaintiff was never denied equal pay for equal work nor promotion on the basis of her sex. Succinctly, no violations of law were established.

### IV. *CONCLUSION.*

I have found, and do not doubt, that some rough hewn humor, vulgarity and sexual conversation occurred in Defendant's workplace. However, neither do I doubt that Plaintiff willingly participated in some of the conduct about which she now complains. It is abundantly clear from the profusion of evidence presented, that equal employment opportunities for this Plaintiff and other female workers were neither denied nor abridged. Such is the office of Title VII. Accordingly,

IT IS ORDERED that judgment of dismissal shall enter in favor of Defendant and against Plaintiff. Defendant shall have its costs herein expended as are allowed by law.