**UNITED STATES of America,**

v.

**Augusto Guillermo FALCON et al., Defendants.**

No. 99–583–CR–SEITZ, 99–583–CR–BANDSTRA.

United States District Court, S.D. Florida.

Feb. 20, 2003.

M. Patrick Sullivan, AUSA, Michael S. Davis, AUSA, Miami.

Richard J. Diaz, Esq., Coral Gables, Co-counsel for Defendant Falcon.

Kenneth J. Kukec, Esq., Miami, Co-counsel for Defendant Falcon.

Katherine Ferro, Esq., Miami, Co-counsel for Defendant Falcon.

Alan S. Ross, Esq., Miami, Counsel for Defendant Christian Magluta.

Michael J. Rosen, Esq., Miami, Counsel for Defendant Manuel Magluta.

Alvin Entin, Esq., Ft. Lauderdale, Counsel for Defendant Aldo Gonzalez.

## ORDER GRANTING GOVERNMENT'S MOTION IN LIMINE TO EXCLUDE TESTIMONY OF DR. JEROME POLIACOFF

SEITZ, District Judge.

THIS MATTER is before the Court on the Government's Motion In Limine to Exclude Testimony of Dr. Jerome Poliacoff. Defendant Augusto Guillermo Falcon ("Falcon") seeks to call Dr. Jerome Poliacoff ("Dr. Poliacoff"), a forensic psychologist, to testify as to his assessment of the personality disorders of key government witness, Marilyn Bonachea ("Bonachea"), and the effect these disorders have on her ability to perceive, recall, and recount events accurately. The Government has moved to exclude this testimony on grounds that it is not scientifically reliable, and merely attacks the witness's credibility, which invades the province of the jury. For the reasons stated below, the Court will grant the Government's motion to exclude Dr. Poliacoff's testimony.

### BACKGROUND

Defendant Falcon, who faces trial on charges of conspiracy to obstruct justice, conspiracy to launder money, obstruction of justice through witness and juror bribery, and money laundering, originally retained Dr. Poliacoff to assist defense counsel in preparing for cross-examination of witness Bonachea. Thereafter, Falcon identified Dr. Poliacoff as an expert witness to be called at trial "to explain, in lay terms, Marilyn Bonachea's psychological makeup...[to] assist the jury to better evaluate Ms. Bonachea as a witness." (Gov.'s Mot. In Limine, Exh. 1 at 1, [hereinafter "Report"]). According to his Report, Dr. Poliacoff expects to testify about five general areas of Bonachea's "psychological, emotional, and interpersonal condition and functioning." (Report at 1).

First, Dr. Poliacoff expects to testify about the nature of personality disorders

and how Bonachea exhibits *Narcissistic Personality Disorder* (a pattern characterized by grandiosity, need for admiration, and a lack of empathy), and *Antisocial Personality Disorder* (a pattern in which there is a disregard for, and violation of, the rights of others). (Report at 2–5). Second, he intends to explain "personality structure as it effects Ms. Bonachea's representation of her recall, description, and accounting of events in her personal history." (Report at 5). Third, the doctor expects to discuss "personality and psychological symptoms and their effect on Ms. Bonachea's cognitive and emotional functioning." (Report at 5). Fourth, he intends to explain how Ms. Bonachea's personality and psychological symptoms affect her ability to exercise judgment. (Report at 5). Fifth, Dr. Poliacoff will explain "personality and psychological symptoms as they relate to Ms. Bonachea's capacity to distinguish truth from fantasy." (Report at 6).

As stated in his Report, Dr. Poliacoff's opinions are based on: (1) his review and analysis of transcripts of direct, cross, and re-direct examination of Ms. Bonachea in previous trials; (2) his review and analysis of Ms. Bonachea's medical records pertaining to her hospitalization and treatment in 1990 and 1996 for substance abuse and emotional problems; (3) his review and analysis of Ms. Bonachea's medical records provided by psychiatrist, Dr. Cava, M.D.; (4) his direct observation of four hours of Ms. Bonachea's live testimony at the trial of *United States v. Jose Fernandez;* and (5) any additional materials that may become available prior to trial. (Report at 1–2). Dr. Poliacoff has not met personally with Ms. Bonachea or conducted a clinical interview.

The Government has moved to exclude Dr. Poliacoff's testimony on the grounds that, *inter alia,* his testimony is not based upon any expert scientific knowledge to satisfy the requirements of Rule 702 of the Federal Rules of Evidence and *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579, 592, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993), and that his testimony improperly invades the jury's function in determining credibility. The Court conducted a day-long *Daubert* hearing to address these matters.

## DISCUSSION

### A. Admission of Expert Scientific Testimony

■ When faced with a proffer of expert scientific testimony under Rule 702, the trial court must function as a gatekeeper and determine whether: (1) the expert is qualified to testify competently regarding the matters he intends to address; (2) the methodology by which the expert reaches his conclusions is sufficiently reliable as determined by the sort of inquiry mandated in *Daubert;* and (3) the testimony assists the trier of fact, through the application of scientific, technical, or specialized expertise, to understand the evidence or to determine a fact in issue. *United States v. Hansen,* 262 F.3d 1217, 1234 (11th Cir.2001).

■ In determining whether the expert's opinions are based on a scientifically reliable methodology, and not mere speculation or conjecture, the Court may consider such factors as: whether the methodology can be and has been tested; whether the methodology has been subjected to peer review and publication; the known or potential rate of error; the existence and maintenance of standards controlling the technique's operation; and the particular degree of acceptance within the relevant scientific community. *Daubert,* 509 U.S. at 592–95, 113 S.Ct. 2786. As the Supreme Court emphasized in *Kumho Tire Co. v. Carmichael,* the trial court's gatekeeping role under *Daubert* "is to make

certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom *the same level of intellectual rigor that characterizes the practice of an expert in the relevant field.*" 526 U.S. 137, 152, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999) (emphasis added).

The Government has not challenged Dr. Poliacoff's expertise as a psychologist or his competence to discuss personality disorders. However, the Government does question the scientific reliability of the methodology used by Dr. Poliacoff to formulate his opinions and conclusions as to Ms. Bonachea's mental state. Additionally, the Government questions whether Dr. Poliacoff's testimony will assist the trier of fact in understanding the evidence or determining a fact in issue.

## B. Scientific Reliability of Dr. Polia- coff's Testimony

█ Upon review of the record and transcript of the *Daubert* hearing, it is evident that Dr. Poliacoff's proffered testimony lacks a scientifically reliable foundation. This is Dr. Poliacoff's first appearance as an expert forensic psychologist in a criminal trial. (Feb. 11, 2003, Tr. at 45). His past federal court experiences have been limited to evaluating plaintiffs on behalf of defendants in civil cases involving sexual harassment and employment discrimination, where emotional distress and damages are at issue.[1]  (Tr. at 43–45). Neither party in this case has provided the

Court with a formal, generally accepted standard for assessing the reliability of expert psychological testimony. However, in a sexual harassment and retaliation suit presently pending before this Court, Dr. Poliacoff, as the defense expert, recently filed an affidavit challenging the scientific reliability of the plaintiff's psychiatric expert testimony. (*See Gloria Medina v. Cedars Healthcare Group, Ltd.*, Case No. 01–5188–CIV–SEITZ, [DE–46] ).

In the *Medina* civil case, Dr. Poliacoff states that "[t]he usual standard of practice for a forensic psychiatric or psychological evaluation for use by the Courts in South Florida (as elsewhere) is governed by both ethical guidelines and specific statutory requirements." (*See Medina*, Case No. 01–5188–CIV–SEITZ, [DE–46] Def.'s Mot. *In Limine*, Exh. B., Poliacoff Aff. ¶ 7). Specifically, Dr. Poliacoff notes that "[s]uch an evaluation should include (a) the administration of appropriate psychological tests, (b) conducting an extended clinical interview, (c) the gathering of data from collateral sources of information (whether by review of relevant documents or interviews with witnesses, or both), (d) a review of relevant empirical research related to the evaluation issue, and (e) the preparation of an expert report, per the local rules governing the admissibility of experts' opinions." (*Id.* at ¶ 8).

Contrary to his own affidavit, Dr. Poliacoff has not satisfied each of the critical components that he believes constitute a

---

1.  Defendant has filed a Supplemental Response to the Government's Objections to Dr. Poliacoff's testimony, which cites four sexual harassment or employment discrimination cases in which expert psychological or psychiatric testimony was relevant to the question of the plaintiff's perception of discrimination or harassment and emotional damages stemming from the alleged discrimination. *See Pascouau v. Martin Marietta Corp.*, 994 F.Supp. 1276 (D.Col.1998); *Lowe v. Philadelphia Newspapers, Inc.*, 594 F.Supp. 123

(E.D.Pa.1984); *Davis v. United States Steel Corp.*, 539 F.Supp. 839 (E.D.Pa.1982); *Sudtelgte v. Reno*, 1994 WL 3406 (W.D.Mo. Jan.3, 1994). None of these cases are remotely applicable to this criminal case or the general propriety of admitting testimony of an expert's diagnosis of a government witness as having personality disorders based on observing four hours of testimony in another trial, reviewing transcripts of the witness' prior testimony, and some medical records.

thorough psychological evaluation, and has not applied the same level of intellectual rigor in this case that characterizes the general practice of expert forensic psychology. Although Dr. Poliacoff has reviewed Ms. Bonachea's prior testimony, examined her medical records from six and twelve years ago, and observed four hours of her live testimony, he has not administered the appropriate psychological tests, conducted an extended clinical interview, reviewed any relevant empirical research, or spoken with any witnesses. (Tr. at 73, 145). In fact, the only person he has spoken with about Ms. Bonachea is defense counsel.

Additionally, while the Court does not possess the relevant experience or scientific expertise to fully analyze the complexities of forensic psychology, a cursory review of one of the expert treatises on which Dr. Poliacoff relies, *Disorders of Personality, DSM–IV and Beyond* (Theodore Millon 2d. ed., 1996), gives the Court serious pause as to the propriety of Dr. Poliacoff even diagnosing Ms. Bonachea as having personality disorders.[2] Furthermore, review of the other treatise on which Dr. Poliacoff relies, *Diagnostic and Statistical Manual of Mental Disorders, DSM–IV–TR* (4th ed., 2000), gives the Court great concern that the Defendant and his expert have greatly oversimplified the complexities and intricacies of psychological and psychiatric evaluations.[3] The most

2. Dr. Million, in the subchapter "Is a Personality Disorder Diagnosis Warranted?" states:
   Asking whether a personality disorder diagnosis is warranted is quite different from asking, "Does the patient 'have' a personality disorder?" The former frames the problem as a functional issue, the latter as a medical or record-keeping one, for which a "present or absent" judgment will be sufficient. Such a distinction may appear subtle, but it has profound implications that inevitably color the entire clinical process. Undoubtedly, the temptation to reify personality disorders, especially in casual conversation, is almost irresistible. Unless carefully checked, it leads to metatheoretical and epistemological misconceptions. Personality disorders are disorders of the entire matrix of the person, of the entire patterning of personality variables at levels as easily observed as behavioral acts and as highly inferential as defense regulatory mechanisms. Personality disorders cannot be medicalized and transformed into disease entities that are readily isolated and expunged through some approved and effective course of treatment. In this sense, the choice of the word "disorders" for the Axis II abnormalities is unfortunate, because it lards Axis II with suppositions that are more consonant with Axis I. *No person is currently alive, has ever been born, nor will ever be born, who "has" a personality disorder. As noted in Chapter 1, such syntactical shortcuts may be useful for convenience in clinical communication, but the nature of the construct disallows their possessing any truth value....* Theodore Millon, *Disorders of Personality, DSM–IV and Beyond* (2d. ed.1996) at 135 (emphasis added).

3. According to the chapter on "Multiaxial Assessment" in *Diagnostic and Statistical Manual of Mental Disorders, DSM–IV–TR* (4th ed., 2000):
   A multiaxial system involves an assessment on several axes, each of which refers to a different domain of information that may help the clinician plan treatment and predict outcome. There are five axes included in the DSM–IV multiaxial classification:
   Axis I    Clinical Disorders
   Other Conditions That May Be a Focus of Clinical Attention
   Axis II    Personality Disorders
   Mental Retardation
   Axis III    General Medical Conditions
   Axis IV    Psychosocial and Environmental Problems
   Axis V    Global Assessment of Functioning
   The use of the multiaxial system facilitates comprehensive and systematic evaluation with attention to the various mental disorders and general medical conditions, psychosocial and environmental problems, and level of functioning that might be overlooked if the focus were on assessing a single presenting problem. A multiaxial system provides a convenient format for organizing and communicating clinical information, for capturing the complexity of clinical situations, and for de-

recent evaluation of Ms. Bonachea dates from 1996, more than six years ago. At that time there were no personality disorder diagnoses such as the ones to which Dr. Poliacoff desires to opine.

■ In performing the gatekeeping task, trial courts must be vigilant in demanding that scientific experts employ in the courtroom the same level of intellectual rigor that characterizes the practice of their profession in the relevant field. *Kumho,* 526 U.S. at 152, 119 S.Ct. 1167. Experts who fall short of this exacting standard will not be permitted to bring their aura of expertise into the courtroom to merely serve as "hired guns" for their respective parties and opine on issues of credibility which fall solely within the jury's province, and outside the witness' area of expertise. Because Dr. Poliacoff has failed to fulfill the minimum requirements for a scientifically reliable psychological assessment as outlined in his own affidavit, the Court finds that Dr. Poliacoff's opinion fails to satisfy the reliability prong under *Daubert.*

### C. Dr. Poliacoff's Assistance to the Jury

■ Additionally, Defendant Falcon has not sufficiently demonstrated that Dr. Poliacoff's testimony satisfies Rule 702's requirement that an expert assist the untrained lay juror in determining intelligently a particular disputed issue of fact or understanding the evidence in this case. It is well-settled in this Circuit that, absent extreme or unusual circumstances, expert scientific testimony concerning the truthfulness or credibility of a witness is inadmissible because it invades the jury's province in determining credibility. *United*

States v. Beasley, 72 F.3d 1518, 1528 (11th Cir.1996). Additionally, expert opinions regarding "a witness's reliability in distinguishing truth from fantasy [are] inadmissible for impeachment purposes." *United States v. Jackson,* 576 F.2d 46, 49 (5th Cir.1978). Only in rare cases, where there is temporally relevant and reliable documentation that a witness' capacity for perception and recollection is severely hampered, will a court permit an expert to testify to the witness' mental incapacity. *United States v. Partin,* 493 F.2d 750, 762–65 (5th Cir.1974) (permitting expert psychiatrist to testify to witness' mental state where witness "voluntarily committed himself to a hospital, reporting auditory hallucinations...and also complaining that at times he thought he was some other person").

Recognizing that expert testimony attacking Bonachea's credibility is clearly inadmissible, Defendant Falcon has repeatedly maintained that Dr. Poliacoff will not be called to offer an opinion on Bonachea's credibility. (Def.'s Resp. at 2). Rather, Falcon asserts that Dr. Poliacoff "will testify much more generally regarding the symptomology of the personality disorders suffered by Bonachea, thereby better equipping the jury to make *its own* determination as to Bonachea's credibility." (*Id.*). Even assuming that Dr. Poliacoff limits his testimony to a general discussion of the effects of Bonachea's alleged personality disorders on her ability to recollect and recount events, nothing in his expert opinion will assist the jury in understanding evidence or determining facts relevant to the guilt or innocence of Defendant Falcon.

scribing the heterogeneity of individuals presenting with the same diagnosis. In addition, the multiaxial system promotes the application of the biopsychosocial model in clinical, educational, and research settings.

*Diagnostic and Statistical Manual of Mental Disorders, DSM–IV–TR* (4th ed., 2000) at 27.

Throughout the *Daubert* hearing, Dr. Poliacoff testified that the purpose of his testimony is to assist the jury in understanding how Ms. Bonachea's "reality is encoded and processed and recorded," and how Ms. Bonachea "colors" her reporting of events. (Tr. at 84–86). However, when asked to elaborate on the basis for his opinion that Bonachea colors her testimony, Dr. Poliacoff stressed that "the observation of her in the courtroom was more important than reading the written word." (Tr. at 85). He further elaborated that:

> It is the presentation, it is the observation I think that comes through. It is the coyness, it's the seductiveness, it's the inflexion, it's the presentation, it's the willingness or unwillingness to respond. Those are the characteristics that are observable to the other senses, to the eyes and the ears and the guts as opposed to what you read in the written record.

(Tr. at 86).

Essentially, Dr. Poliacoff bases his opinion upon the very same testimonial attributes of Ms. Bonachea that the jurors themselves will have an opportunity to observe and analyze over the course of an expected several days of direct and cross-examination. Presumably, on cross-examination, Defendant Falcon will do what his previously tried co-defendants did and directly attack Ms. Bonachea's credibility by inquiring into, among other things: her felony conviction; her prior false testimony under oath; her cooperation agreement with the Government; the 205 year sentence she originally faced; her drug use, nervous breakdown, and hospitalization during the time of the conspiracy; her breach of security and drug use while in the witness protection program; her admitted theft of millions of dollars in drug money; her statements on tape showing disregard for the justice system; her letters directing her family to lie before the grand jury; her statement suggesting that she expected 15% of any money that the Government recovered in the case; and any inconsistent statements in the six other trials in which she has testified about these same events.

At no point during the *Daubert* hearing could Dr. Poliacoff point to any inaccuracies in Ms. Bonachea's testimony that resulted from her "colored" perceptions. What the hearing revealed is that the testimony Dr. Poliacoff would give, based on his assessment of Ms. Bonachea's courtroom demeanor, does not truly address Ms. Bonachea's perception and recollection of events involving Defendant Falcon. Instead, it seeks to comment on her testimony and focuses on her motivations for and alleged incompleteness of her prior testimony. The following exchange between the Court and Dr. Poliacoff at the *Daubert* hearing illustrates this point:

> THE COURT: And what about that testimony, and let's take the testimony of her meetings in upstate New York. What was it about that testimony that you believed her personality colored?
>
> THE WITNESS: Her reporting in person of the events was kind of, as I recollect, underplayed. She kind of had gotten caught and she had decided to be cooperative and the presentation was one of being a cooperative person. There was a tape played of her speaking with whoever she was with in upstate New York, and the tone of that was completely different, certainly would not be acceptable in the courtroom. And I think that the two in contrast reflect her putting-I keep restraining myself from saying this-but putting a spin on things as determined by her personality. So she comes out in all cases as kind of the good guy or the poor victim. And that is a function of her personality and her representation of herself so that she

maintains her good reputation, if you will, at least in her own eyes.

THE COURT: And how is a jury going to use that information?

THE WITNESS: How would a jury use that information? I believe that they would be able to understand the presentation and the motivation as coming from a need to appear good, and would, therefore, count or discount some of what was said in the light of the motivation, if you will, based on personality for reporting things in a certain way. Was she saying that because that was to look good, or was she saying that to aggrandize herself and how much is it colored by her style of relating.

. . . .

THE COURT: Let's stick with Marilyn Bonachea because of the specifics here, because I have yet to understand precisely how her asserted personality disorders color her perception. And what I have gathered thus far is that she has a need to appear to be the good guy. That's one manifestation of how she colors things. Can you give me other specifics?

THE WITNESS: Can I give you other specifics?

THE COURT: Yes, based on your four-hour observation of her in court and your review of this material.

MR. DIAZ: Do you want to break them down into narcissistic and antisocial, or does it matter?

THE WITNESS: Well, I could do that. I was starting to think of the antisocial in terms of her representing herself as, I come back to the 205 years reduced to five, and her being asked an open-ended question and not answering it, I see that as a reflection of both the antisocial element of it, she got away with something, and the narcissistic thing.

THE COURT: But tell me how she colors. Point to the answer and show me how those personality disorders color the answer.

THE WITNESS: The question is, "Did you make a deal?" The answer was, "Yes." Not, "Yes, I got a frightening sentence of 205 years reduced to five," or not, "I did in the interests of saving myself, or I did it-or not that I did it because I can get away with it, and I even asked you for money which you didn't give me." It was a, "Yes."

THE COURT: What is wrong with that? Isn't that an accurate answer?

THE WITNESS: The question was asked-Yes, it is an accurate answer. But I think that it is not a complete answer. It is accurate but not complete. . . .

(TR. at 87–90).

■ As the above exchange reveals, Dr. Poliacoff's proposed expert testimony is nothing more than an effort to supplement Defendant's other efforts to impeach Ms. Bonachea, attack her credibility, and comment on her testimony. Such extrinsic opinion evidence from a forensic psychologist as to a witness' psychological motivations for the way the witness testifies is not only irrelevant, but is clearly inadmissible under Federal Rule of Evidence 608. Furthermore, such testimony regarding the complexities of personality disorders and traits will mislead and confuse the jurors, and distract them from the real issue in this case, namely whether Defendant Falcon conspired to obstruct justice and launder money.

Finally, there is no documented medical evidence that Ms. Bonachea is, or was, in a delusional or hallucinogenic state which would rise to the level of allowing an expert to testify to her ability to accurately observe or recall particular events. *See Partin*, 493 F.2d at 762–65. No other psychologist or psychiatrist who has treated Ms. Bonachea has assessed her with

these or other personality disorders. Moreover, Dr. Poliacoff's opinions as to Ms. Bonachea's sense of self-importance, sense of entitlement, lack of empathy, arrogant attitude, deceitfulness, impulsivity, and failure to conform to social norms are irrelevant to the jury's job of determining the guilt or innocence of Defendant Falcon, and go solely to the witness' credibility. A thorough cross-examination of Ms. Bonachea by Defendant Falcon will provide the jury with sufficient tools to fully assess her credibility.

## CONCLUSION

Based upon the lack of a sound, scientific basis for Dr. Poliacoff's opinion regarding Ms. Bonachea's personality disorders, and the irrelevance of his testimony to the jury's fact-finding function, Dr. Poliacoff's proffered testimony has failed to satisfy the reliability and relevancy prongs of *Daubert*. Permitting Dr. Poliacoff's testimony would run contrary, to the well-established principle that, absent extraordinary circumstances, credibility determinations are for the jury, and not expert witnesses. Opening the door to testimony by expert psychologists such as Dr. Poliacoff would subject every witness to a personality disorder (or even personality trait) assessment and distract jurors from their primary function of assessing the guilt or innocence of the defendant who stands trial. Accordingly, it is hereby

ORDERED that the Government's Motion In Limine to Exclude Testimony of Dr. Jerome Poliacoff is GRANTED.